**Cathy E. BLACK et vir., Appellants,**

v.

**KROGER CO., Appellee.**

**No. 16521.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

Aug. 21, 1975.

Rehearing Denied Sept. 18, 1975.

Philip E. Hosey, Galveston, for appellants.

Mills, Shirley, McMicken & Eckel, Alton C. Todd, Russell Serafin, Galveston, for appellee.

EVANS, Judge.

This is a suit for damages for false imprisonment.

Cathy E. Black sued her former employer, Kroger Co., alleging that she had been illegally detained by the company's agents who had accused her of theft by failing to ring up purchases of merchandise while em-

ployed as a checker at one of its grocery stores. The jury found that Kroger through its agents, servants or employees had caused Cathy Black to be falsely imprisoned; that prior to the date in question, Cathy Black had failed to ring up purchases of merchandise and that Kroger had a reasonable belief that she had failed to record such purchases. The jury failed to find, however, that Kroger had detained Cathy Black in a reasonable manner and for a reasonable period of time for the purpose of investigating her activity. The jury found the sum of $25,700.00 would be reasonable compensation for the expenses incurred in obtaining her release and for her physical and mental suffering. The trial court entered a take nothing judgment non obstante veredicto.

■ In order to uphold the judgment of the trial court, we must determine that there was no evidence upon which the jury could have made the findings relied upon by Cathy Black. In making this determination we must consider all the testimony in the light most favorable to Cathy Black and every reasonable inference must be indulged in her favor. *Douglass v. Panama, Inc.,* 504 S.W.2d 776 (Tex.1974).

■ False imprisonment in Texas is the direct restraint by one person of the physical liberty of another without adequate legal justification. Its essential elements are: (1) a wilful detention of the person; (2) a detention without authority of law; and (3) a detention without the consent of the party detained. *J. C. Penney Co. v. Duran,* 479 S.W.2d 374 (Tex.Civ.App. —San Antonio, 1972, writ ref'd n.r.e.). Where it is contended that the unlawful detention is brought about by threat, it must be shown that the threat was such as would inspire in the threatened person a just fear of injury to his or her person, reputation or property. *Kroger Co. v. Warren,* 420 S.W.2d 218 (Tex.Civ.App.—Houston [1st], 1967, no writ).

Cathy Black was eighteen years old on April 5, 1974, the date of the incident in question. She was married, had a two year old child and had completed the tenth grade of school. Her mother had worked for Kroger for thirteen or fourteen years and her husband had worked for the company for two and a half to three years. She had first started working for Kroger in 1972 when she was still in school but left in October, 1972 to have her baby. She returned to the store as a checker in April of 1973 and worked in that capacity until September, 1973 when she was transferred to work in the drug department of the store. She worked in the drug department until January, 1974, when she was again assigned duties as a checker in the grocery section.

On April 5, 1974, Cathy Black had taken her regular coffee break between noon and 12:30 p. m. and had been visiting with a friend in the back room of the store where extra merchandise was kept. When her break was over she started walking up the aisle to the front of the store where she met the store manager. He told her to come upstairs to his office with him because he needed to talk to her. They walked through two rooms into "a little room with a table and a few chairs." The room had no windows and was just big enough for a table and four or five chairs. It had one door and could be reached only by walking through the two larger rooms. The lighting consisted of unshaded bulbs. When her employer opened the door to the small room, Cathy Black saw a man and woman sitting at the table. The man introduced himself as Roy Mathews who worked for "Kroger Security." Cathy Black testified:

"Q. What did your boss do at that time?

"A. He left.

"Q. Then what happened?

"A. Then he told me to close the door and come sit down, then, they asked me if I knew why I was up there and I told them, 'No,' and they told me that they worked for Kroger Security and they said that if I wasn't perfectly honest with him they were going to handcuff me and take me to jail.

"Q. Did they say why they were going to take you to jail?

"A. They said that they knew that I had stolen money and if I didn't admit to that, they would handcuff me and take me to jail.

"Q. Did you think about turning around and leaving?

"A. Yes, sir.

"Q. Did you?

"A. No, I didn't.

"Q. What kind of voice were they using when they told you this?

"A. Well, I was real scared, you know. It was enough to scare me.

"Q. Were they using a loud tone of voice or a soft tone of voice?

"A. It wasn't soft; no, sir.

"Q. So, how long were you up there after you went in and sat down, I suppose and then—go ahead and tell the jury what happened.

"A. Okay. Well, so I sit down and he asked questions like about my family, my mother, my husband and my mother-in-law and my father-in-law. Then he said that he was going to name off the months and if I don't name the amounts I took that month, he was going to put me in jail and it would be a long time before I saw any of my family, my little girl, you know, any of them. So he started naming off months, and I started naming off figures and even the time that I worked in the Drug Department, I just named off any figure. I didn't even check except for, maybe one day out of the two weeks, or something like this whenever we got real busy, and he needed an extra checker up there, I'd go check for him until he could get somebody to relieve me. He just named off the months and I just named off any figures   .   .

"   .   .   .
"Q. What were your thoughts during this questioning?

"A. I just had it in my mind that, you know, that they were going to put me in jail no matter what I did and I wasn't going to see my little girl, you know, for a long time.

"   .   .   .
"Q. What happened after he would name a month and tell you how much? Then, what would happen? Did he write up something or did he tell you to, or what?

"A. He wrote the months down on a piece of paper. Everytime I said something—He had told me what I had taken, and after he got through naming off all the months, He added everything up, and he told me that I owed him at least seven hundred dollars, and if I didn't come up with that money, they would put me in jail, handcuff me and put me in jail and it would be a long time before I even got out, and that was on a Friday and I had gotten paid $79.25 from my paycheck. So, he said that he could take $75 from my paycheck to help pay back this money and he asked me if I had any money saved or anything like this. And I told him I was in the Credit Union, and, I believe, he asked me my account number and I told him I didn't know. So he went downstairs and he called the Credit Union. It was money they took out of my paycheck every week to put towards savings and he went downstairs to call the Credit Union in Houston to ask them how much that I had in there. They said, I believe, it was $149 and something. So, he found out my account number and he told me to write—he told me what to write saying they could take that money out of the Credit Union and put it towards the money that I owed them.

"Q. That's $149? Then, your paycheck, they took $75 and they left you a little bit; is that correct?

"A. Yes, sir, four dollars.

"Q. Did they take anything else from you?

"A. Yes, sir. Whenever my husband had gotten my income tax money in, we decided to open up a checking account. We had never had one before. So, we put our money in the bank in Galveston, and whenever this came around, I had two hundred and nineteen dollars in my bank account. They told me to write out a check for $200 and they would take me down to the bank to get it out.

"Q. Did they take you down to the bank?

"A. Yes, sir, they did."

Cathy Black testified that she was interrogated about one and a half hours in the small room before being taken to the bank. At the conclusion of this initial interview, she was told to sign and did sign a statement admitting that she had taken designated sums of money while she was working as a checker. Her testimony continued:

"Q. All right. Did both Mr. Mathews and this woman go with you to the bank?

"A. Yes, sir, they did.

"Q. What did they tell you to do, if anything?

"A. They told me to write out a check. They told me, at first, to write to Kroger's a two hundred dollar check, so I did and whenever we got to the window, the lady said I would have to write it out to cash. I scratched it out, Kroger, and put cash on it and they got their money and we went back to the store.

"      .    .    .

"Q. Then what happened? What did you do next?

"A. We drove back to the store and we sat in the car and they were asking me, you know, I had better start thinking where I could get $275 more dollars. They started suggesting then that I call my mother-in-law or my mother or my brother-in-law or somebody like that to get the money from them. I told them they didn't have that kind of money.

So, finally, I thought of my sister, Linda I thought maybe she had $275 saved somewhere.    .    .    .

So, they told me to tell her I needed $275 or they were going to put me in jail, and not to bring a check, but to bring cash."

Mrs. Linda Mabe, Mrs. Black's sister, testified that after her sister called her, she called Kroger and spoke with the man who was with her sister. He told her that if she did not bring the money in thirty minutes they were going to take her sister to jail.

After talking to her sister on the phone Cathy Black accompanied Mr. Mathews and the woman companion back to the room in the upstairs offices. They stayed there 30 to 40 minutes more until Cathy Black's sister arrived with the money. Mathews and the woman then gave Cathy a receipt which recited: "Received of Cathy E. Black, $550.00 cash for restitution of moneys from Kroger Company. This money was taken over a period of several months. Balance of $150.00 to come from Kroger Credit Union."

Cathy Black denied that she had ever taken any money from Kroger Company. She said she had been complimented on her good work as an employee of the store and that she felt that she had been doing the best job that she could.

It is the position of Kroger that the facts of this case bring it within the rationale of *Safeway Stores, Inc. v. Amburn*, 388 S.W.2d 443 (Tex.Civ.App.—Ft. Worth, 1965, no writ). In that case the employee Amburn was loading produce crates on a grocery truck when his district manager requested

that he accompany him "for the purpose of talking to somebody," to a secluded area at the back of the store. This was a "U" shaped area about 14 feet in length and 12 feet in width and was the most private place available in the store for a conference. Amburn was there introduced to a security agent for the store. The agent told Amburn that he had checked the tapes from the cash registers and that "they were all the evidence needed to send Amburn to the penitentiary." Upon being confronted with the tapes and the alleged theft, Amburn signed a statement admitting he had been guilty of stealing $500.00 from the cash register. The trial court entered judgment on the jury's verdict in favor of Amburn. The appellate court reversed and rendered, holding that there was no direct evidence to support the submission of issues on false imprisonment. In its opinion the court stated that while the threats of arrest and imprisonment might have invalidated Amburn's confession, they had no bearing on the issue of false imprisonment since there was no detention by force or threats of force. The court further concluded that its decision was not inconsistent with its prior opinion in *Skillern & Sons, Inc. v. Stewart*, 379 S.W.2d 687 (Tex.Civ.App.—Ft. Worth, 1964, writ ref'd n. r. e.).

In *Skillern* the plaintiff, Marie Stewart, a widow, had been employed for almost ten years by Skillern's and worked in their cosmetic department. She was told by the store manager that she had to go to a meeting with him and they went to the offices of Skillern's security agent where she was questioned about the loss of merchandise. Several weeks later she was told that she would have to return to the security agent's office and she was taken to a small room where two strange men started "throwing accusations" at her. She said the agent beat on the desk and told her that she had stolen and insisted she write a confession. They accused her of stealing numerous items and said, "We have the goods on you. We know you stole a coffee pot. We know you have been stealing mon-

ey. All we want you to do is tell us what else you have stolen." She was advised that she could not leave until she wrote a statement that she had stolen money and merchandise. She refused to sign, but left the room and went to a phone to call her son. She then went back to the lobby to wait for the store manager. She and the manager were leaving the store when the store supervisor ran out and ordered her back. The store manager took her arm, turned her around and they went back into the room where the security agent told her to sign a confession or she was going to the penitentiary, that she had no other choice. She was told that she would either sign or would never get out of there, that they were going to send her to the penitentiary. She finally signed a statement indicating her guilt. She also testified that before she signed the statement the security agent would put his hands on her shoulders when she tried to rise out of the chair. The appellate court held that the evidence supported the jury's finding of false imprisonment and that it was not error for the trial court to refuse to give an additional instruction to the effect that the nature of the false imprisonment must be calculated to have detained the person and from which the person could not by ordinary means relieve herself.

Kroger contends that there were no threats of force or efforts to use force to detain Cathy Black on the occasion in question; that she never made any effort to leave and that there was no impediment to her leaving. Kroger points out that Cathy Black made no request to use the telephone; never asked that the security agents leave her alone; never refused to answer questions and that she voluntarily accompanied the store manager and remained in the room during the course of the interview. It argues that she voluntarily accompanied the security agents to the bank and again upon their return to the store, and that the entire episode lasted only two hours.

On cross-examination Cathy Black testified that she initially went upstairs volun-

tarily but that she did not leave the room during the interview because she knew she could not. She didn't ask to call her husband or an attorney because she knew it would do no good. She answered questions because she knew she had to. She testified that she did not have fear of bodily injury but she would have "done anything" if they would just let her go home. The following testimony is indicative of her reason for not leaving the interview:

"Q. Did you think you had to stay there?

"A. Yes, sir, because they just kept on telling me if I didn't, you know, say I had done that, that they were just going to handcuff me and put me in jail and that I wouldn't see my little girl for a long time.

"Q. Is that why you signed that statement?

"A. Yes, sir.

"Q. Have you ever taken any money from the Kroger Store?

"A. No, sir.

"Q. Is that statement that you signed true?

"A. No, sir.

"Q. Why did you sign it, again?

"A. I felt like I had to."

■ The decisions of the Ft. Worth Court of Civil Appeals in the *Amburn* and *Skillern* cases demonstrate that the relationship between the parties and the circumstances surrounding the incident have an important bearing upon the question of whether particular words or acts have inspired "a just fear of injury" to person, reputation or property. In *Amburn,* the produce loader, a man, was interviewed in a relatively open area on the main floor of the store. He was told only that there was evidence upon which he might be sent to the penitentiary. In *Skillern,* the cosmetic department employee, a widow, had been employed by the store for a considerable number of years. She was threatened over a period of time

by the security agent and advised that if she did not sign the confession, she was going to the penitentiary and that she had no other choice. There was also some physical force used in detaining her in her chair during the interview, but this does not appear to have been crucial to the court's decision.

■ In considering whether Cathy Black could voluntarily have terminated the interview with Kroger's security agent without giving the statement admitting her guilt, or whether she was so overawed and intimidated by the agent's threats that she was not able to exercise her free will, the jury was at liberty to consider not only the actual words spoken but the relative size, age, experience, sex and physical demeanor of the participants. *A. Harris & Co. v. Caldwell,* 276 S.W. 298 (Tex.Civ.App.—Dallas, 1925, writ dism'd). The jury could also consider the bearing which Cathy Black's employment might have upon her submission to the authority of her employer.

■ There are some distinct differences in the facts of this case from those reviewed in either the *Amburn* or *Skillern* cases. Cathy Black's mother and her husband had also been employees of Kroger and her testimony indicated that Cathy Black entertained a healthy respect for the authority of her store manager. Cathy Black was obviously without extensive business experience, having been married and worked as a clerk at Kroger's since she was sixteen years of age. Considering the incident in the light of these circumstances, the jury was at liberty to believe Cathy Black's testimony that she was directed by the store manager to accompany him to a small room where she was introduced to two strangers, one of whom immediately spoke to her in a loud voice and accused her of theft. This stranger whom she took to be higher in authority than the store manager threatened that he was going to put her in jail if she didn't name off amounts she had taken for a period of months and that it would be a long time before she saw any of

her family. He told her that he knew she had stolen money and that if she didn't admit to having taken the money, they were going to handcuff her and take her to jail. She testified that she stayed in the room and admitted the theft because of the threats made by the security agent that if she did not confess, she would be handcuffed, taken to jail and would not see her daughter for a long time. From this testimony, the jury could reasonably have concluded that the threats of Kroger's agent intimidated Cathy Black to the degree that she was unable to exercise her free will to leave the interview and that she was unreasonably detained. *Newton v. Rhoads Bros.,* 24 S.W.2d 378 (Tex.Comm'n App.1931, holding approved).

We next consider Kroger's cross-points that the jury's findings with respect to the unlawful detention of Cathy Black are against the great weight and preponderance of the evidence. Kroger calls attention to the testimony of the security agents to the effect that Cathy Black voluntarily participated in the interview and admitted taking the money after being confronted with written reports tending to show that she had failed to ring up certain purchases. Although the testimony of these witnesses cast doubt on the testimony of Cathy Black, and directly contradicted her testimony that she was threatened with being handcuffed and taken to jail if she did not sign the statement admitting her guilt, the jury was entitled to accept her version of the incident. We cannot say that the jury's findings are against the overwhelming weight and preponderance of the evidence and overrule Kroger's cross-points 1 and 2.

█ Kroger's cross-points 3 and 5 assert that the jury's finding of damages in the amount of $25,700 was without evidentiary support and is against the great weight and preponderance of the evidence. In its cross-points 4 and 6, Kroger asserts that the damage finding is so excessive that a new trial should be granted and, alternatively, that a remittitur should be ordered.

The evidence established that Cathy Black was required to pay $700.00 to Kroger as restitution under circumstances evidencing duress and hardship. She testified that she had not paid this money voluntarily:

"Q.   .   .   .   Did you give them your money of your own free will and accord?

"A. No, I felt like if I didn't, they were going to take me to jail anyway, so, why not just give it to them. It didn't mean that much.

"Q. Did you fear he was going to actually handcuff you and take you down to jail?

"A. That's all he kept on throwing at me the whole time that we were up there.

"Q. Did you fear that he was actually going to do that?

"A. I knew he would.

.   .   .   .   .

"Q. Did you give permission of your own free will and accord for the Kroger Company to take your money?

"A. No, I didn't."

Cathy Black's testimony tended to show that she had been extremely frightened and embarrassed by the incident and there was testimony that subsequent to the occurrence she had been a "nervous wreck," was always worried and irritable. She testified that she no longer enjoyed the association of several of her fellow employees and the jury could have inferred from the evidence that her reputation had been damaged by the occurrence.

We are of the opinion that there was evidence to support the jury's award of damages and that its finding is not against the great weight and preponderance of the evidence. Despite the substantial nature of the award, we cannot say it is excessive under the circumstances of the case and the jury's considerable discretion in such matters. *Skillern & Sons v. Stewart, supra.*

The trial court's judgment is reversed and judgment rendered in favor of appellant, Cathy Black, for the sum of $25,700.00, and interest at the legal rate from and after February 7, 1975, the date of the court's judgment below, together with costs of suit, including costs of this appeal.