Edward G. **EZRAILSON,** Appellant,

v.

Rod J. **ROHRICH,** Larry H. **Hollier,** and Jack B. **Robinson,** Appellees.

No. 09–01–038 CV.

Court of Appeals of Texas, Beaumont.

Submitted Sept. 20, 2001.

Decided Dec. 27, 2001.

Kenneth M. Morris, Morris & Campbell, Houston, for appellant.

John Cornyn, Atty. Gen., Heather L. Horton, Asst. Atty. Gen., Austin, for appellees.

Before WALKER, C.J., BURGESS and GAULTNEY, JJ.

## OPINION

DAVID B. GAULTNEY, Justice.

Three medical science researchers, employed by the University of Texas Southwestern Medical Center in Dallas, wrote an article published in a September 1996 medical journal. Appellant Edward G. Ezrailson sued them for libel. The three researchers obtained a summary judgment and Ezrailson filed this appeal.

Two of the researchers, Rod J. Rohrich and Larry H. Hollier, are medical doctors, and the other, Jack B. Robinson, has a Ph.D. in biochemistry. Ezrailson has a Ph.D. in biochemistry. This case concerns

libel law in the field of medical science research.

### BASES FOR THE SUMMARY JUDGMENT

■ The summary judgment does not specifically state the grounds on which it was granted; under such circumstances an appellate court must affirm a summary judgment if any of the asserted summary judgment grounds are meritorious. *See FM Properties Operating Co. v. City of Austin,* 22 S.W.3d 868, 872–73 (Tex.2000). The grounds stated in appellees' motion are as follows:

> First, the article at issue does not refer to Plaintiff, let alone defame him. Second, the article itself is qualifiedly privileged, it was written about a topic of medical importance and communicated to the appropriate medical community. Third, the university research scientists who wrote the article, as state employees, are entitled to a grant of qualified immunity because they acted in good faith and within the course and scope of their employment. Finally, the statements about which Ezrailson complains are either substantially true or simply statements of opinion, and not fact. In the alternative, Plaintiff has no evidence that the statements are false, an essential element of his claim.

We consider dispositive the arguments that the medical science research article at issue here is not libelous because it discusses an assay—a medical science research test—rather than plaintiff personally and because, as the motion states, "[i]n libel actions where the topic at issue is a matter of public health and medicine, such as the test claiming to detect breast im-plant leakage in this case, opinions on the issue must be protected." (Footnote omitted). We conclude the medical science research article is not reasonably capable of a defamatory meaning.

### THE CONSTITUTION

■ Opinions concerning issues of public concern are at the heart of the protection afforded by the First Amendment to the United States Constitution. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 758–59, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). However, the First Amendment does not provide absolute protection to all statements of "opinion"; opinions that imply statements of fact do not receive absolute protection. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18–20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *see generally* Robert D. Sack, *Protection of Opinion Under the First Amendment: Reflections on Alfred Hill, "Defamation and Privacy Under the First Amendment,"* 100 Colum. L.Rev. 294 (2000).

Article I, section 8, of the Texas Constitution, the State's counterpart to the First Amendment, provides in part that "[e]very person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press." The Texas Supreme Court has reserved decision on whether the Texas Constitution affords greater protection to a statement of opinion than the protection afforded by the First Amendment.[1] *See Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 122

---

1. In this case, neither party has briefed whether the Texas Constitution provides greater protection for opinions than the United States Constitution. We also note that neither party has briefed whether Ezrailson is a limited purpose public figure, although he has authored at least one published article on the relevant subject matter and has appeared as a speaker on the topic at seminars for research scientists. Because of the lack of briefing on appeal and at the trial court, we do not address those legal issues.

n. 5 (Tex.2000); *see generally* Charles W. "Rocky" Rhodes, *A Proposal for Interpreting Corresponding United States and Texas Constitutional Guarantees in the New Millennium,* 51 Baylor L.Rev. 269 (Spring 1999).

## STANDARD OF REVIEW

Although both a no-evidence and a traditional motion for summary judgment were filed in this case, our analysis is under the traditional standard. The standard of review of a summary judgment in a defamation case is the same as in other summary judgment cases, despite the presence of constitutional considerations. *See Casso v. Brand,* 776 S.W.2d.551, 556–57 (Tex.1989). A summary judgment for a defendant will be upheld when the defendant negates an essential element of plaintiff's theory of recovery. *See Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). In reviewing a summary judgment, an appellate court must take as true the evidence favorable to the nonmovant. *Id.* Summary judgment is appropriate when a dispositive question of law is involved. *See Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470 (Tex.1991). Whether an unambiguous statement is reasonably capable of defamatory meaning is a dispositive question of law in a libel case. *See Musser v. Smith Protective Servs., Inc.,* 723 S.W.2d 653, 655 (Tex.1987).

## THE THRESHOLD LEGAL ISSUE

Libel is defined by statute as a "defamation expressed in written or other graphic form that tends to ... injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or finan-

cial injury." TEX. CIV. PRAC. & REM.CODE ANN. § 73.001 (Vernon 1997). In order to be libelous, a statement must be capable of having a defamatory meaning. *See Musser,* 723 S.W.2d at 655.

In a libel action, the trial court initially must determine as a matter of law whether the words used are reasonably capable of defamatory meaning by considering the alleged defamatory statement as a whole and in light of the surrounding circumstances; the determination is based upon how a person of ordinary intelligence would perceive the entire statement. *Id.* at 654–55. "The question should not be submitted to the jury unless the language is ambiguous or of doubtful import." *See Garcia v. Burris,* 961 S.W.2d 603, 605 (Tex.App.-San Antonio 1997, pet. denied). The statements alleged to be defamatory must be viewed in their context; they may be false, abusive, unpleasant, or objectionable to the plaintiff and still not be defamatory in light of the surrounding circumstances. *See San Antonio Express News v. Dracos,* 922 S.W.2d 242, 248 (Tex.App.-San Antonio 1996, no writ). The entire communication—not mere isolated sentences or portions—must be considered. *See Musser,* 723 S.W.2d at 655. Appellees asserted in their motion for summary judgment that the article was an opinion on a matter of public health and medicine and, thus, protected; and they asserted that the article concerned the assay, not Ezrailson personally. In essence, appellees claim the opinions, as expressed in their article, are not reasonably capable of a defamatory meaning. This is a question of law.

In his reply brief Ezrailson contends the "incapable of defamatory meaning" issue was not urged by appellees as a ground in their summary judgment motion; therefore, summary judgment could not have been granted on a ground not contained in

the motion. *See Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex.1993). We agree with his statement of the law. However, we read the motion for summary judgment as including the issue. Appellees have not raised it for the first time on appeal. The motion for summary judgment urges "the article at issue does not refer to Plaintiff, let alone defame him." Appellees also contend the article is an expression of opinion and is, therefore, not actionable. The motion also states generally that "[w]hether statements are expressions of opinion or are actionable assertions of fact is a question of law to be determined by the court." The motion urged that the opinions concerned matters of public health and that opinions in that area must be protected. By maintaining the article is an assertion of protected opinion concerning a public health matter rather than an actionable false assertion of fact and by correctly stating that the issue is one of law to be determined by the court, appellees effectively asserted a summary judgment ground that required the trial court—and now this Court—to analyze the motion under the construct of whether the research article is capable of a defamatory meaning. That is the threshold legal issue we must confront. We affirm the summary judgment on this legal issue.

### THE SURROUNDING CIRCUMSTANCES

Ezrailson co-authored an article in 1993 which suggested that patients with breast implants have elevated levels of antibodies that react with silicone. The assay used in the study was one that Ezrailson personally researched and developed as chief executive officer of Emerald Biomedical Sciences ("Emerald"). The hypothesis of Ezrailson's article was that the Emerald assay could be helpful in determining whether breast implants were leaking silicone gel into the body. Emerald sought to market the assay, but its efforts were frustrated by an assessment by the United States Food and Drug Administration ("FDA") that the assay had not been proven effective.

Some three years later, appellees published their article based on their research study focusing on the theory of the "immunogenicity of silicone." The theory has medical science significance; if it is determined that silicone is antigenic, i.e., causes the body to form antibodies directed against the presence of silicone, such a finding would impact the use in humans of implantable devices that use hard silicone. Appellees did not conduct their study with Emerald's assay, but instead used a modification of an earlier assay referred to in the article as the Goldblum ventriculoperitoneal (VP) shunt assay. Their 1996 article expressed the opinion that the effectiveness of silicone antibody assays, and, by implication, Emerald's assay in particular, was questionable. Emerald Biomedical Sciences, not Ezrailson, was expressly named in the article as the developer of an assay similar to the Goldblum assay; a modification of the Goldblum assay was used by appellees in their research. Ezrailson was named in a footnote as one of the authors of the above-described 1993 article.

Appellees' article was published in a medical science journal. Ezrailson complained to appellees' employer, a state medical research university. The university conducted an independent evaluation of the appellees' research and writing and concluded that the work was sloppy, contained careless mistakes, and did not support appellees' conclusion that the Emerald assay was ineffective. Appellees' article was publicly retracted. Appellees apologized in writing to Ezrailson.

### THE PUBLIC ISSUE

Appellees attached as summary judgment evidence another article referencing

the Emerald assay; this one was published by the American Council on Science and Health, Inc. in February 1996, some seven months before appellees published their article. In the article, which was entitled "Silicone Breast Implants: Why Has Science Been Ignored?", the author noted that Dr. Noel Rose of Johns Hopkins University "repeatedly" tested Emerald's assay and "repeatedly" found it to be ineffective.

Appellees also attached as summary judgment proof a February 1996 "Notice to Readers" from the Centers for Disease Control and Prevention (CDC). Published in the MORBIDITY AND MORTALITY WEEKLY REPORT, the Notice is entitled "Diagnostic Tests for Silicone Breast Disease" and reads as follows:

> During August 1992, the Food and Drug Administration (FDA) became aware of diagnostic testing profiles offered by commercial laboratories for evaluating silicone breast disease....
>
> None of these products have been cleared (510k process) or approved (Premarket Approval) by the FDA. Their diagnostic accuracy is not established, and the value and usefulness of these tests remain speculative. In managing patients with silicone breast implants, the Public Health Service advises clinicians to continue to rely on established techniques: history, physical examination, conventional and established laboratory tests for immunologic disease, and radiologic imaging.
>
> In some instances, tests for silicone breast disease are being marketed under a label "For Research Use Only; not for Use in Diagnostic Procedures." These tests are intended for research use and should not be used for patient diagnosis or management....

According to Ezrailson's deposition testimony, the February 1996 Notice encompassed the Emerald type of assay. As expressed in the CDC notice, the FDA had already indicated the safety and effectiveness of an assay such as Emerald's would have to be established before it could be legally marketed. The FDA warned that "[a]ny commercial distribution of this device" prior to appropriate FDA approval would be illegal. The last test using the Emerald assay occurred on April 20, 1996, after the issuance of the "Notice" quoted above and before publication of appellees' article.

## EZRAILSON'S OBJECTIONS

Ezrailson complains that the article "Silicone Breast Implants: Why Has Science Been Ignored?" is hearsay. We disagree. The existence of the article itself, rather than the truth of the matters asserted in the article, is the relevant evidence here. *See* TEX.R. EVID. 801(d) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). The existence of the article, even if we assume the substantive matters stated in it are incorrect, evidences a public controversy existed in the medical science field concerning the subject matter of appellees' article. *See generally Butler v. Hide–A–Way Lake Club, Inc.*, 730 S.W.2d 405, 411 (Tex.App.-Eastland 1987, writ ref'd n.r.e.).

Ezrailson contends the trial court erred in overruling his objection to four affidavits attached by appellees as summary judgment proof. The affidavits were those of the three appellees (Rohrich, Hollier, and Robinson) and Dr. Robert S. Munford. Arguing that the affidavits contain opinions and conclusions of undesignated experts, Ezrailson contends the summary judgment proof was not competent. Ezrailson's complaint has no merit. We note simply that Rule 166a of the Texas

Rules of Procedure sets forth rules applicable to summary judgment practice. *See* TEX.R. CIV. P. 166a. It has been held that in a summary judgment proceeding there is no duty to supplement answers to interrogatories in order to use an affidavit of a previously undisclosed witness. *See Purvis Oil Corp. v. Hillin,* 890 S.W.2d 931, 939 (Tex.App.-El Paso 1994, no writ). Another court similarly held that the rules of discovery and sanctions for failure to designate expert witnesses do not apply to summary judgment proceedings. *See State v. Roberts,* 882 S.W.2d 512, 514 (Tex.App.-Austin 1994, no writ). Furthermore, here three of the affiants were parties to the litigation. These witnesses were fact witnesses and their affidavits also set forth relevant facts. Dr. Munford was also a fact witness whose identity, area of knowledge, and expertise were known to Ezrailson because he was the chair of the panel that investigated Ezrailson's complaints and recommended retraction of the article.

Both in his brief and reply brief, Ezrailson alleges various evidentiary and briefing errors. First, he contends that appellees' arguments in their brief improperly rely on evidence that Ezrailson submitted as summary judgment proof. His argument has no merit. We find nothing in the rules or case law that would preclude appellees from arguing on appeal based on the nonmovant's own summary judgment evidence the trial court was asked to consider. *See* TEX.R. CIV. P. 166a. Second, Ezrailson contends appellees refer in their brief to evidence not found in the record. He points out that he was the party who submitted Rohrich's deposition excerpts and that his submission included only the bracketed portions of testimony on any given page. We find nothing in the record to explain the brackets, and we will not accept a declaration of fact outside the record as an explanation of what is in the record. Third, Ezrailson complains of the trial court's ruling on appellees' objections to his affidavit. He argues the trial court's ruling lacks specificity and therefore amounts to a non-ruling because the ruling is unclear. If Ezrailson considered the trial court's ruling to be inadequate, it was his responsibility to timely object or call it to the trial court's attention in some manner. *See* TEX.R.APP. P. 33.1. Having failed to do so, the issue is waived. Moreover, in his reply brief Ezrailson acknowledges that the same evidence was contained elsewhere in the record. Any error in admitting evidence is harmless if the same evidence appears elsewhere in the record. *See Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989).

### THE MEDICAL SCIENCE ARTICLE

Appellees' article begins with a brief discussion of a controversy within the medical science community concerning breast implants. The questions addressed by appellees were whether silicone causes the body to form antibodies directed against silicone present in the body (whether the silicone is in the form of VP shunts or breast implants) and whether these antigen-antibody complexes cause systemic symptoms in the breast implant patient. The second paragraph of the article references a study done on the sera of patients with ventriculoperitoneal (VP) shunts (a shunt tubing made of silicone) and sets out in summary form the finding of the study.

Although Ezrailson points to numerous statements in the article as false, it is the third paragraph of the article which contains the following linchpin statement that Ezrailson attacks as defamatory:

The assay used to determine the level of antibodies in the VP shunt experiment was similar to an enzyme-linked immunosorbent assay (ELISA) developed by Emerald Biomedical Sciences

and termed a silicone activity reactivity assay (SARD). (footnote omitted).

The article states that the assay used in the VP shunt (a modification of which the appellees used in their research) is similar to the Emerald assay developed by Ezrailson. Ezrailson maintains the assays are not similar, and the statement and the conclusions derived from it are false and defamatory.

After noting the similarity of the two assays, the article then points out a difference. While the Emerald assay "apparently was developed to detect ruptures of silicone breast implants" and "to quantitate the level of immune response in breast implant patients," appellees' investigation studied the level of antisilicone antibodies in a group of patients undergoing tissue expansion with saline-filled silicone shell expanders to quantitate the antibody response, if any, to the presence of the silicone shell alone.

Following the introduction pointing out a similarity and a difference between the assays, the article then describes the "Methods and Materials" used by appellees in their study, the results obtained, and the conclusions reached. Appellees' conclusions were as follows:

> These results, especially the variability and lack of response on dilution, raise questions about the validity and reproducibility of the ELISA assay and all of the data published using it to quantify antibody levels in patients with silicone exposure. Certainly, the stated purpose of the assay, to detect implant rupture, must be called into question. Pending further study of this ELISA, no firm conclusions should be drawn from previous results, and certainly no clinical decisions.

As noted above, Ezrailson maintains the statement of similarity is false, and the conclusions that by inference apply to him, are likewise false and serve to defame him. We agree that the conclusions reached by the article are referable to the Emerald assay; however, as a matter of law the medical science research article is not reasonably capable of defamatory meaning.

In *Milkovich,* the United States Supreme Court held that there exists no "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich,* 497 U.S. at 18, 110 S.Ct. 2695. One underlying rationale for the *Milkovich* holding was that expressions of opinion may be more than expressions of ideas; expressions of opinions sometimes imply assertions of objective facts that may be actionable in a defamation suit. *Id.,* 497 U.S. at 18–19, 110 S.Ct. 2695. To be defamatory the statement must be false. *See Musser,* 723 S.W.2d at 655. Here, the authors' hypothesis that the two assays are similar implies an assertion of fact—namely a sharing of common characteristics.

During deposition testimony, Dr. Rohrich pointed out that the statement declaring the two assays to be similar is substantially true, because the two assays are both ELISAs (enzyme-linked immunosorbent assays) that test for silicone antibodies. Although Ezrailson at one point in his deposition denies their similarity, at another point he acknowledges it. The foundational similarity is beyond any real dispute; considering the world of medical science, these two assays both attempt to determine the presence of silicone antibodies and both are enzyme-linked immunosorbent assays.

However, uncontradicted summary judgment evidence also establishes significant differences between the assays. As part of his summary judgment proof, Ezrailson offered the Panel Report from the University of Texas Southwestern Medical Center, which convened a panel of experts from the school to examine the

allegations against appellees. Appellees offered as summary judgment evidence their apology letter to Ezrailson and their retraction article published in the *Journal of the American Association of Plastic and Reconstructive Surgeons, Inc.* All three documents categorically state the assays are "substantially different" (Panel Report), "completely different" (apology letter), or "not related in any manner or fashion" (retraction article). The retraction article explains in detail how the materials and methodology in the two assays are different.

Though the evidence clearly and concretely establishes dissimilarities between the assays, this evidence does not serve to negate or even raise a fact issue regarding the indisputable overarching area of similarity: in the world of medical science, both assays are ELISAs which attempt to look for the body's reaction to the presence of silicone. That foundational similarity is not dispositive, however. The more complex meaning of the statement of similarity—namely that the assays are *sufficiently* similar to warrant the conclusion that the results of appellees' experiment with their assay could be used to judge the effectiveness of the Emerald assay—is conceded by appellees to be erroneous.

■ We believe this incorrect, more complex meaning is not reasonably capable of defamatory meaning. The more complex meaning states an hypothesis; the statement is a scientific medical proposition that forms a partial basis for appellees' criticism of silicone antibody assays. To the extent the article refers to Ezrailson at all, the reference to him questions his ideas which resulted in the assay. The gist of the article is a criticism of Ezrailson's medical science ideas.

CRITICISM OF MEDICAL SCIENCE IDEAS

As we have noted, whether words are capable of a defamatory meaning is a threshold question of law for the court. *See Campbell v. Salazar,* 960 S.W.2d 719, 725 (Tex.App.-El Paso 1997, pet. denied). Whether any statement of fact implied by an opinion is reasonably capable of defamatory meaning must also be determined by the court. *See Turner,* 38 S.W.3d at 114. In *Musser,* the Texas Supreme Court explained as follows:

The law in the area of libel is well settled. In trying a libel action, the initial question for determination is a question of law to be decided by the trial court: were the words used reasonably capable of a defamatory meaning. The court construes the statement as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement. Only when the court determines the language is ambiguous or of doubtful import should the jury then determine the statement's meaning and the effect the statement's publication has on an ordinary reader. The threshold question then, which is a question of law, is whether [the statements] are reasonably capable of a defamatory meaning.

*Musser,* 723 S.W.2d at 655 (citations omitted). In making this threshold legal determination, a trial court must determine how a person of ordinary intelligence would perceive the entire statement (i.e., the article)in light of all the surrounding circumstances. *See Marshall v. Mahaffey,* 974 S.W.2d 942, 950 (Tex.App.-Beaumont 1998, pet. denied). If the language is not ambiguous, it is "the duty of the trial court to determine whether it [is] libelous or not." *Taylor v. Houston Chronicle Publ'g Co.,* 473 S.W.2d 550, 554 (Tex.Civ.App.-Houston [1st. Dist.] 1971, writ ref'd n.r.e.).

Appellees' article is not ambiguous. Appellees asserted the VP shunt assay was

similar to the Emerald assay. Since appellees used a modification of the VP shunt assay in their study, any conclusions of ineffectiveness they derive from their experiment are by inference referable to Emerald's assay.

At the time of the article's publication in 1996, a medical science controversy over a public health issue was brewing; the effectiveness of silicone antibody assays was being questioned and cast into doubt in the medical science field. Based on these surrounding circumstances, no person of ordinary intelligence would perceive the article as defaming Ezrailson personally.

Scientists continuously call into question and test hypotheses and theories; this questioning advances knowledge. In another context, the United States Supreme Court has described scientific conclusions as "subject to perpetual revision." *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Court noted:

> The scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance.

*Id.* Here, appellees' hypothesis was shown to be incorrect; "and that in itself is an advance." *Id.* If advancement in medical scientific knowledge is essential to society, "inquiries into these problems, speculations about them, stimulation in others of reflection upon them, must be left as unfettered as possible." *See Sweezy v. New Hampshire*, 354 U.S. 234, 262, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring).

In making the threshold determination of whether a medical science article is reasonably capable of defamatory meaning in light of surrounding circumstances, we believe a court should weigh the need to protect intellectual reputation against society's great need to permit an unfettered discussion of medical science hypotheses. Certainly statements are not immune from the control of defamation law merely because they appear in medical science articles. However, in the area of medical science research, criticism of the creative research ideas of other medical scientists should not be restrained by fear of a defamation claim in the event the criticism itself also ultimately fails for lack of merit. We believe calling the medical science research article here defamatory would serve to unduly restrict the free flow of ideas essential to medical science discourse.

## CONCLUSION

We conclude as a matter of law that the statements in appellees' medical science article were not defamatory. *See generally Spelson v. CBS, Inc.*, 581 F.Supp. 1195, 1202 (N.D.Ill.1984), *aff'd without op.*, 757 F.2d 1291 (7th Cir.1985) (noting that the subject matter, medical science, is at best an inexact science in which numerous and widely varied approaches and philosophies exist). The essence of the article is that appellees' study raised doubts about and called into question the validity of both appellees' and Emerald's assays, and the article urged that the ELISA assays should not be relied upon until further study was conducted. The article was published in the context of a discussion in the medical science community of ideas relating to public health—ideas which are not only of great concern to the medical science community but to the public at large. The article expressed disagreement with Ezrailson's medical science ideas, and therefore "belongs to the language of controversy rather than to the language of defamation." *See Dilworth v. Dudley*, 75 F.3d 307, 310 (7th Cir.1996) ("[S]cholars have their own remedies for unfair criticisms of their work—the publication of a

rebuttal."); *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir.1994) ("Scientific controversies must be settled by the methods of science rather than by the methods of litigation."). Because appellees' medical science research article is not reasonably capable of defamatory meaning, we affirm the trial court's judgment. Since we affirm the trial court's judgment on this basis, we need not address issues raised concerning other grounds contained in the motion for summary judgment.

AFFIRMED.