

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00175-CV

LYNDA W. TOMLINSON AND
HUSBAND DAVID TOMLINSON

APPELLANTS

V.

JOHN MCCOMAS, CYNTHIA
"CISSY" WILSON, MARVIN
JENSEN, TOM ROMAN, AND MIKE
ROBINIUS

APPELLEES

----------

## FROM THE 355TH DISTRICT COURT OF HOOD COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

This is a summary judgment appeal. Appellants Lynda W. Tomlinson and her husband David Tomlinson filed suit against Appellees John McComas, Cynthia "Cissy" Wilson, Marvin Jensen, Tom Roman, and Mike Robinius seeking

---

[1]See Tex. R. App. P. 47.4.

damages from allegedly defamatory statements made at a homeowners' association meeting. The trial court granted summary judgment for Appellees and denied the Tomlinsons' motion for partial summary judgment. In a single issue on appeal, the Tomlinsons argue that the trial court erred by granting summary judgment for Appellees and by denying the Tomlinsons' motion for partial summary judgment. We will affirm.

## II. Factual and Procedural Background

Pecan Plantation Owners' Association (PPOA) is a homeowners' association comprised of members owning approximately 2,800 homes in the Pecan Plantation subdivision located near Granbury, Texas. In 2008, a development group, referred to by the parties to this appeal as the Anthony Group, sued PPOA over the collection of road impact fees. In February 2009, PPOA's board of directors met to discuss a proposed settlement of the Anthony Group's lawsuit. At the time of that meeting, Bob Lowrey, Jr. served as president; Lynda Tomlinson served as treasurer; and McComas and Wilson served as directors on the board. A motion was made to approve the settlement, Lynda seconded the motion, and the motion passed by a seven-to-two margin. McComas and Wilson voted against accepting the settlement.

In March 2009, Lynda was elected president of PPOA, and she and the directors learned that past-president Lowrey had gone to work for the Anthony Group on a part-time basis. Concerned that some conflict of interest might have existed between Lowrey and PPOA at the time PPOA's board voted to approve

2

the settlement of the Anthony Group lawsuit, PPOA's directors asked PPOA's attorney about the propriety of the settlement agreement and requested guidance on the proper course of conduct. PPOA's attorney responded with a letter, setting forth several options, including having a discussion with Lowrey, but noting that there was no "blue print for conduct in this regard" and advising that PPOA's board members should "exercise their independent judgment."

Lynda emailed the letter from PPOA's attorney to PPOA's board members. Her email asked whether the matter with Lowrey had been adequately addressed and questioned whether further review was needed. Lynda asked PPOA's board members to respond and indicated action would be taken in accordance with the majority of votes. McComas responded to Lynda's email. McComas expressed his opinion that the settlement was not fair, that a potential conflict of interest existed, and that he wanted additional investigation into the matter. Other PPOA board members responded that they felt that the matter had been adequately addressed.

During the fall of 2009, PPOA board members expressed concerns about Lynda's leadership of PPOA. Appellees called for a special meeting of PPOA's board of directors on October 5, 2009, and the meeting was open to the public. The special meeting was also recorded for replay on the local community television station.

At the special meeting, McComas stated that a group of directors had asked Lynda to step down as PPOA's president and made a made a motion that

she resign from the presidency but not from the board.  The motion was seconded.  Lynda repeated the motion and called for discussion.  One board member voiced his support for Lynda, even after acknowledging that she had made mistakes; another board member claimed that he had been excluded from conversations about requesting Lynda's resignation.  Lynda asked if there was any further discussion before a vote was called, and McComas said that he had prepared a statement.  McComas then read his statement out loud.  The complained-of portions of McComas's statement, as transcribed by PPOA, are set forth in italics below:

> The Road Impact Fee lawsuit was negotiated during a part of this administration.  And her . . . at this time, in the very last days of that administration's term.  Within the term of that administration, a key negotiator went to work for the Anthony Group.  Madam President was made aware of the potential conflict of interest.  And I underlined potential conflict of interest, just potential.  And refused to allow an investigation into this potential conflict, ignoring requests to consider alternate legal advice and ignoring requests to stop the Judge[']s signature that would make the gentleman everything but being ????instrickible. [sic] *This ill minded*[2] *rejection of all the requests not only cost PPOA serious money, thousands and possibly millions of dollars, but it eliminates our ability to limit Anthony Groups' truck weight limits unless they are specifically working a on* [sic] *single family dwelling.*  So when they are building the runway out there, they can drive anything they want to over our roads, as long as there is no immediate physical damage.  *Madam President's actions were in description[:] unethical, unprofessional, and in direct conflict of interest of the best interest of our membership.*  The policy in this membership/Association is that it will

---

[2]Appellees argue that the phrase used by McComas at the meeting was "single minded," and this is the phrase the Tomlinsons used in their original petition.  The Tomlinsons changed the phrase to "ill minded" in their amended petition, and PPOA's transcription of the meeting uses the term "ill-minded."

be the policy of PPOA to maintain the highest ethical and legal standards in conduct of its business. To be scrupulously honest and straight forward in all of its dealings, and to avoid situations where there might, just might give . . . either the appearance of unethical or illegal behavior. We didn't even investigate it, in fact the way it was settled was okay, I want you board members to read the settlement, there will be no further discussion, you come back and you tell me whether you like this settlement or not, but that's where it's going. [Emphasis added to show portions complained of.]

After McComas read his statement and other PPOA board members made statements, Lynda called for a vote on the motion. No one voted in favor of the motion, and the meeting was adjourned. A month later, PPOA's board reconvened. Another motion to remove Lynda as president was made and seconded; this time, the motion passed by a vote of five to three.

The Tomlinsons subsequently filed a defamation suit against Appellees based on the statement that McComas had read at the October 5, 2009 meeting. The Tomlinsons alleged that McComas was the spokesperson for Appellees, and that as their spokesperson he published

the knowingly false statements that Lynda's "ill-minded rejection" of all requests made to her concerning a negotiated settlement of a lawsuit by the board of PPOA of which Lynda was only one of nine members who voted with six other members to two to accept the settlement, "not only caused PPOA serious money, thousands and possibly millions of dollars," but it eliminated the board's "ability to limit Anthony Groups' weight limits unless they are specifically working a (sic) on single family dwelling" and her "actions were . . . unethical . . . and in direct conflict of interest of [. . .] our membership."

The Tomlinsons contend that the above statements are defamatory because "they have injured Lynda's reputation, exposing her to public hatred, contempt

5

and ridicule impeaching her honesty, integrity and reputation." The Tomlinsons pleaded that the statements were made with actual malice; that Lynda was damaged by the defamatory statements because "she has been caused mental anguish requiring professional treatment"; and that as a result of the mental anguish, her husband had suffered loss of consortium.

Appellees filed a traditional motion for summary judgment, and the Tomlinsons filed a traditional motion for partial summary judgment. The trial court held a hearing on the competing summary judgment motions and signed a final take-nothing judgment in favor of Appellees. The trial court did not specify the grounds on which it granted Appellees' motion for summary judgment. The Tomlinsons perfected this appeal.

### III. SUMMARY JUDGMENT FOR APPELLEES AND AGAINST THE TOMLINSONS WAS PROPER

In their sole issue, the Tomlinsons argue that the trial court erred by granting Appellees' motion for summary judgment and by denying the Tomlinsons' motion for partial summary judgment. The Tomlinsons contend that two specific statements by McComas are defamatory: his statement that Lynda's "ill-minded" or "single-minded" rejection of requests for investigation into the potential conflict of interest between PPOA and former president Lowrey concerning the settlement agreement had "cost PPOA serious money, thousands and possibly millions of dollars" and his statement that Lynda's actions were

6

"unethical[,] . . . and in direct conflict of interest of the best interest of our membership."

## A. Summary Judgment Standard of Review in Defamation Suit

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). A defendant who conclusively negates, as a matter of law, at least one essential element of a cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010), *cert. denied*, 131 S. Ct. 1017 (2011); *Brewer v. Capital Cities/ABC, Inc.*, 986 S.W.2d 636, 643 (Tex. App.—Fort Worth 1999, no pet.); *see* Tex. R. Civ. P. 166a(b), (c). Thus, to be entitled to summary judgment, a defendant in a defamation suit has the negative burden to prove the absence of one of the essential elements of defamation, e.g., that the statement complained of was not defamatory. *Ramos v. Henry C. Beck Co.*, 711 S.W.2d 331, 333–34 (Tex. App.—Dallas 1986, no writ).

## B. The General Law Concerning Defamation

"Defamation" is generally defined as the invasion of a person's interest in his or her reputation and good name. Prosser & Keeton on Torts § 111, at 771 (5th ed. 1984 & Supp. 1988). "Defamation" encompasses both libel and slander. By statute, Texas law defines "libel" as a defamation expressed in written or other graphic form that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the

7

natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury. Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 2011). Although "slander" is not statutorily defined, at common law, slander is a defamatory statement that is orally communicated or published to a third party without legal excuse. *Randall's Food Mkts, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995).

To prevail on a defamation cause of action, the plaintiff must prove that the defendant (1) published a statement, (2) that was defamatory concerning the plaintiff, (3) while acting with actual malice regarding the truth of the statement where the plaintiff was a limited purpose public figure. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998), *cert. denied*, 526 U.S. 1051 (1999); *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 574 (Tex. App.—Austin 2007, pet. denied). In this context, actual malice refers to the defendant's attitude toward the truth of what he said. *WFAA-TV, Inc.*, 978 S.W.2d at 573. Actual malice means that the defendant made the statement knowing that it was false or with reckless disregard about whether the statement was false or not. *HBO v. Harrison*, 983 S.W.2d 31, 36 (Tex. App.—Houston [14th Dist.] 1998, no pet.).

### C. Whether a Statement Is Capable of Defamatory Meaning Is a Question of Law

Whether a statement is capable of a defamatory meaning is a question of law. *See Fort Worth Star-Telegram v. Street*, 61 S.W.3d 704, 708 (Tex. App.—

8

Fort Worth 2001, pet. denied) (citing *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987)). We must view the statements alleged to be defamatory as a whole and in light of the surrounding circumstances; the determination is based upon how a person of ordinary intelligence would perceive the entire statement. *Ezrailson v. Rohrich*, 65 S.W.3d 373, 376 (Tex. App.—Beaumont 2001, no pet.). Statements alleged to be defamatory must be viewed in their context; they may be false, abusive, unpleasant, or objectionable to the plaintiff and still not be defamatory in light of the surrounding circumstances. *Id.* We must consider the entire communication, not mere isolated sentences or portions. *Musser*, 723 S.W.2d at 655. Purely subjective assertions or opinions that do not imply the existence of undisclosed facts and do not misconstrue the facts are not actionable as defamation. *Bentley v. Bunton*, 94 S.W.3d 561, 583–84 (Tex. 2002); *see also Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989) (explaining that "[a]ll assertions of opinion are protected by the first amendment of the United States Constitution and article I, section 8 of the Texas Constitution"). This is particularly so when the facts underlying an opinion are set out in the publication itself, thereby allowing the listener to evaluate the facts and either accept or reject the opinion. *Brewer*, 986 S.W.2d at 643. Instead, to be actionable as defamation, a statement must be an assertion of verifiable fact, that is, a statement that purports to be verifiable. *Bentley*, 94 S.W.3d at 583–84.

9

## D. Application of the Law to the Present Facts

McComas's full statement from the October 5, 2009 special meeting is as follows:[3]

> Just a couple of words of comment on some of the statements. President Tomlinson, for whom I have high regard, was counseled and I did . . . from the first, since the early days of her administration, and there has not been a moment that this whole, this entire group has tried to help her get through this. (I don't know what is causing the feedback.) And we have met and we have discussed at length the issues that are on the table here. I would just like you to listen with an open mind and understand the moral and ethical dilemma that this group finds our selves in. Okay, please? This movement is not directed at the employee, if anything it is supportive of, to get away from the micro-management and let Mr. Bartholomew run this company as he was hired to do. At any rate, today we are not gathered to remove a member from the board. Members of the Association elect the members of the board members/board of directors. Board members then elect, among themselves the Board member that they wish to lead them throughout the coming year. Each time that it is in the best interest of the Association to replace the officers an internal board business is the subject of consideration at a special meeting. We are here. The Board members requesting this meeting do so with no personal agenda and excludes no group, with no exceptions, particularly the PPCMA. This action is not a coop, as somehow rumored. We do however need to consider today our current leadership and search for answers which will help us arrive of what is in the best interest of our association and its membership. As legally elected directors of this association, each of us took an Oath of Office to defend and fulfill the dictates. And all that means is those that are put upon us by the Bylaws. It has come to out attention that there have been continued violations of our governing documents, that we feel are inappropriate. We have a fiduciary duty to both the Association and ourselves to assure the Association and its funds are managed in an open manner,

---

[3]We note that the statement contains grammatical errors and sentences that do not make sense; however, we set forth McComas's statement exactly as it appears in PPOA's unofficial transcription of the special meeting that is in the record before us.

10

according to the governing documents we swore to defend. This meeting is called only after a great deal of consideration, thought, angst, back-and-forth, trying to reconcile the differences, trying to make things work as they should according to the Bylaws. After numerous unsuccessful attempts to reach an agreement following the transfer of leadership, allowing the transfer of leadership it then became a consideration for the Association and membership. The last effort failed for compromise, because it included Cissy Wilson's resignation from the Board. It is this groups feeling this 15 years, Granbury City Council woman's views is a huge untapped Board resource. And she was elected by the membership, in an election where she garnered the highest vote count. For us to ask her to resign so that Ms. Tomlinson would step down does not seem just. My resolve remains strong and anyone adds less to this inescapable action from this meeting. Under our current leadership we are faced with an ethical dilemma to uphold the moral, ethical, and fiduciary responsibility of this community that we are elected to serve or we compromise our integrity. I will not do that. In my campaign for the board, I stated I will serve with integrity. Certainly not political outcome, I am not a politician. Therefore to resolve our ethical dilemma we asked Mrs. Tomlinson to step down from the board presidency, for the betterment of our community and allow the Board to elect a new President. Who I hope will be Board Member, Jim Miller. Some of the issues that have plagued us, and still haunt us are:

In working with the budget, the salary ranges and employment contracts for all PPOA upper Management have not been shared. Repeated Board requests have been denied. It is unclear what these salaries are. How can we approve the proposed budget without this information? Where is the integrity in that?

The Road Impact Fee lawsuit was negotiated during a part of this administration. And her . . . at this time, in the very last days of that administration's term. Within the term of that administration, a key negotiator went to work for the Anthony Group. Madam President was made aware of the potential conflict of interest. And I underlined the potential conflict of interest, just potential. And refused to allow an investigation into this potential conflict, ignoring requests to consider alternate legal advice and ignoring requests to stop the Judges signature that would make the gentleman everything but being ????instrickible. *This ill minded rejection of all the requests not only cost PPOA serious money, thousands and*

11

*possibly millions of dollars, but it eliminates our ability to limit Anthony Groups' truck weight limits unless they are specifically working a on single family dwelling.* So when they are building the runway out there, they can drive anything they want to over our roads, as long as there is no immediate physical damage. *Madam President's actions were in description; unethical, unprofessional, and in direct conflict of interest of the best interest of our membership.* The policy in this membership/Association is that it will be the policy of PPOA to maintain the highest ethical and legal standards in conduct of its business. To be scrupulously honest and straight forward in all of its dealings, and to avoid situations where there might, just might give the either the appearance of unethical or illegal behavior. We didn't even investigate it, in fact the way it was settled was okay, I want you board members to read the settlement, there will be no further discussion, you come back and you tell me whether you like this settlement or not, but that's where it's going.

On several occasions, Madam President violated the Communications Policy, with her articles in the Columns potentially discrediting Pecan members and incurring PPOA legal fees to offset potential liable lawsuits. To read the PPOA policy, it says Communications should strive for impartial treatment of issues and dispassionate handling of controversial subjects. That was certainly controversial. It should provide a discussion forum for the exchange of comment and criticism. Editorials and expressions of personal opinion should be clearly labeled as such. Concern for community, business or person interests should not cause the PPOA communication to distort nor misrepresent the facts.

Let's go on to the Anthony Group's development with the Landings. Director Roman advised the Board that the Anthony Group was presenting their preliminary development plans to the County Commissioner's Court for approval at their regular meeting. The Board decided and the Board discussed this at length, to send the LENMO Chair, then, Mr. Frank Andrews. There was concern with the plans and drainage, and asked the County to exercise due diligence before approving them. Mrs. Tomlinson interceded that evening, after the Board, but before the County hearing and based on the advise of an Anthony Group employee and she touched again with our legal, our law firm; advised not to do anything but wait until the development is completed. And if it had problems at that time, don't accept it, and begin legal proceedings. Mr. Andrews did exactly that and sat in the Commissioner's hearing with an Anthony

Group employee, thus giving/denoting PPOA's approval of these plans. Subsequently the preliminary plat was accepted by the County and approved. Later, and again at the urging of Director Roman, PPOA Board and certain members did become involved and has stopped the development until appropriate plan is submitted to the County and approved by them. Mrs. Tomlinson's action was in direct violation of the Board consciences and severely jeopardized PPOA's ability to insure the development was not harming our existing member's homes.

And to prepare for this meeting to defend her position, Ms. Tomlinson spent PPOA legal fees in violation of the following policy: Budgets, Contracts, Checks, Deposits and Funds, no Director of the Board of Directors, Committee Chairperson or Committee member may spend or commit to spend any budgeted or unbudgeted funds of the Corporation without the approval of the Board of Directors. Our General Manager, who must control this budget, was not even aware that there was interaction between Mrs. Tomlinson and our new and better, much improved legal team.

Mrs. Tomlinson has and continues to meet with the Anthony Group on long range planning and other issues in violation of the extraordinary meetings policy in the LENMO Agreement. Additionally, the board has agreed that all communications with the Anthony Group will go through the Lenmo Chair. This has been ignored by Mrs. Tomlinson. It was agreed to provide continuity to communications, one voice, the Board being communicated through the Lenmo Chair, not being restrictive, but to have continuity. The PPOA Policy reads that the President and one other Director who will have been selected by the BOD in an Open Meeting and the General manager will handle all extraordinary meetings such as those with the Developer or any other outside entities concerning PPOA business. This is flat policy violation.

The current interviews with PPOA Audit firm . . . Every year we choose to continue or find a new audit firm. During this year's interviews with the auditing firms, it was discovered by the audit committee that we lost $159,000, due to, of membership monies, due to, let me find my script folks, I'm sorry, . . . due to PPOA's failure to comply with the state sales tax recovery requirements. Mrs. Tomlinson directed the board to keep this from the membership. This directly violates our personal ethics, PPOA's Mission Statement, PPOA's Policy Statement, which I read; the

13

officers, the board members and management of the Corporation will set an example of the highest ethical conduct. The corporation expects complete candor and total honestly of all of its officers, board members, managers, and employees to assure compliance with this policy.

There are a number of things that go on every day in our board activities that we are not following the policy. And again, we have asked to follow the policy. I don't want to be up here, I don't want to be subject to lawsuits, I don't want to be personally liable, and I don't want to be responsible to you, the members of this Association, we want to do things right. Some of the things that aren't happening correctly; the board of Directors must approve any expenditure or funding that is not approved in the budget or knowingly exceeds the approved budget. And we are not doing that. The Board of Directors must also approve any transfer of budgeted funds between line items or between departments. We are not doing that. The General Manager and his designee shall have the authority to sign checks up to and including $1,000. The Board must approve all expenditures after $1,000. And by having the President of the organization to sign the check for that over $1000 expenditure does not give the Board of Director's approval, we did not approve it. All contracts and agreements with cumulative costs exceeding $1,000 must be approved by the Board of Directors and signed by the President, Treasurer, or other officer of the Corporation. The terms and conditions of all personal contracts and agreements must be in writing and approved by the Board of Directors. This Board of Directors, does not, once again seen any of these and yet we are asked by you and the Finance Committee to approve a budget, but we don't know what the contracts or obligations and salaries are. I don't get it. Again, how does a conscientious director approve a budget without these items.

Once again, this group of dedicated directors simply asking Mrs. Tomlinson to step down and allow the election of a new president who can resolve these moral and ethical dilemmas. Allow this Board and community to begin restoring trust amongst us. This is probably, it is, the hardest thing, the most difficult thing I have been involved in, in my total life. Working on this Board, more than anything coming to this Board meeting, this specially called board meeting, when it could have been resolved without this action. I thank you very much for your ears, your consideration, as to each of the group that are trying to resolve this moral, ethical dilemma we

find ourselves in. We have the power and votes to depose Mrs. Tomlinson but we choose not to do that. We ask Mrs. Tomlinson, in good conscience, to step down. Should she not do that, then an option is to back away and work with the board to solve these issues. I thank you again. [Emphasis added to show portions complained of.]

After viewing the two specific complained-of statements in the context of McComas's entire statement, and considering the forum in which McComas read his statement—at a specially-called homeowners' association meeting to address the issue of removal of PPOA's president—we hold that the statements are not defamatory as a matter of law. As set forth above, McComas expressed his opinions regarding the way Lynda presided over matters affecting PPOA. He stated that her "ill-minded" or "single-minded" rejection of requests for investigation into the potential conflict of interest between PPOA and former president Lowrey concerning the settlement agreement had "not only cost PPOA serious money, thousands and possibly millions of dollars, but it eliminates our ability to limit Anthony Groups' truck weight limits unless they are specifically working a on [sic] single family dwelling." He stated that, "Madam President's actions were in description[:] unethical, unprofessional, and in direct conflict of interest of the best interest of our membership" and noted that "[t]he policy in this membership/Association is that it will be the policy of PPOA to maintain the highest ethical and legal standards in conduct of its business" and "[t]o avoid situations where there might, just might give the either the appearance of unethical or illegal behavior."

15

The two statements by McComas that the Tomlinsons allege are defamatory simply express McComas's opinions—neither statement constitutes the assertion of a verifiable fact or purports to be verifiable—and opinions are not actionable for defamation. *See id.*; *Vice v. Kasprzak*, 318 S.W.3d 1, 22 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (holding statement that plaintiff, who acted as president of board of directors for homeowners' association and attorney of record for subdivision developer in actions against association members for delinquent maintenance fees, had engaged in "unethical business" was an opinion and was not actionable as defamatory statement); *Brewer*, 986 S.W.2d at 643 (holding that statements in "20/20" news report program that plaintiffs—nursing home owners—were responsible for patient abuse and had engaged in "profiteering" were, based on context and viewed in light of entirety of report, opinions that would not support defamation action); *Falk & Mayfield, L.L.P. v. Molzan*, 974 S.W.2d 821, 824 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (holding statement accusing plaintiff of "lawsuit abuse" was an opinion and was not actionable as defamatory statement); *see also Double Diamond, Inc. v. Van Tyne*, 109 S.W.3d 848, 854–56 (Tex. App.—Dallas 2003, no pet.) (holding statements in flyer and letter distributed to homeowners criticizing homeowner's association's management of subdivision were not capable of defamatory meaning); *Hadlock v. Tex. Christian Univ.*, No. 02-07-00290-CV, 2009 WL 485669, at *3–5 (Tex. App.—Fort Worth 2009, pet. denied) (holding statements made in faculty meeting—the crux of which were that plaintiff

16

professor had acted unethically and unprofessionally and was guilty of misconduct—were opinions that were not actionable as defamation).

Moreover, the two opinions expressed by McComas are set out in the lengthy statement that he read at the PPOA meeting, and that statement sets forth the factual basis for McComas's opinions. *See Brewer*, 986 S.W.2d at 643. A listener hearing McComas's statement and the two complained-of opinions contained in the statement would be able to hear and to evaluate the facts on which McComas based his opinions and either accept or reject the opinions. *See id*. Based on the facts given in McComas's statement, the persons hearing it or reading it could easily decide for themselves the validity of McComas's opinions concerning Lynda's alleged conduct and its impact. *See id*.

Because—when viewed as a person of ordinary intelligence would perceive the entire statement—the two opinions expressed by McComas and complained of by the Tomlinsons are not actionable as defamatory statements as a matter of law, Appellees conclusively negated an essential element of the Tomlinsons' defamation claim. Accordingly, we hold that the trial court did not err by granting Appellees' motion for summary judgment or by denying the Tomlinsons' motion for partial summary judgment.[4] *See, e.g., Double Diamond,*

---

[4]The Tomlinsons do not point to any defamatory statements made by Wilson, Jensen, Roman, and Robinius; therefore, summary judgment is proper for them as well. To the extent that the Tomlinsons rely on McComas's opinions as being on behalf of the board and as extending to the remaining Appellees, we have held that such opinions are not actionable as defamatory statements as a

17

*Inc.,* 109 S.W.3d at 854–55 (holding summary judgment for defendant proper because the complained-of statements were not defamatory as a matter of law); *Marx v. Elec. Data Sys. Corp.*, No. 07-08-00022-CV, 2009 WL 1875505, at *9 (Tex. App.—Amarillo June 30, 2009, no pet.) (holding summary judgment for defendant on plaintiff's slander claim proper because statements, such as "yeah, you know, the sneaky snake is here," were not defamatory as a matter of law).

We overrule the Tomlinsons' sole issue.

## IV. CONCLUSION

Having overruled the Tomlinsons' sole issue, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL: DAUPHINOT, WALKER, and MEIER, JJ.

DELIVERED: November 17, 2011

---

matter of law and therefore cannot be grounds for holding the remaining Appellees liable.

18