02-11-003-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00003-CV

 

 


 
 
 Leslie Burton
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Carter BloodCare, Employment Practices Solutions,
 Inc., and Susan Sorrells
 
 
  
 
 
 APPELLEES 
 
 


 

 

----------

 

FROM THE 342nd
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

          Appellant
Leslie Burton appeals the trial court’s final summary judgment, which the court
rendered in favor of appellees Carter BloodCare, Employment Practices
Solutions, Inc. (EPS), and Susan Sorrells.  Appellant contends in five issues
that the trial court erred by granting summary judgment against her claims for
age discrimination, false imprisonment, intentional infliction of emotional
distress, breach of contract, and defamation.  We affirm.

Background
Facts

          In
August 2002, when appellant was over fifty years old, Carter BloodCare, a
not-for-profit blood center, hired her to be the director of donor collections.[2] 
Appellant directed fixed-site collections, mobile collections, staff
scheduling, and mobile staging (preparing supplies and equipment for mobile
blood drives).  Three managers—JoEllen Wallis, Brandye Norman, and Carla
Buckendorf—reported directly to appellant, and appellant reported to Joe
Ridley, who was a senior director.  Other employees reported to the managers
who were under appellant’s supervision, so appellant had many direct and
indirect subordinates.  In 2003, in addition to her full-time duties associated
with being the director of donor collections, appellant also began to supervise
Carter BloodCare’s collection training department (which Ridley had previously
overseen), so she gained more employees who reported directly to her.  Appellant
was reluctant to supervise the collection training department, but she received
a pay raise for doing so.

          In
the latter part of 2004 and the early part of 2005, Terrie Henderson, who
directs Carter BloodCare’s human resources department, began receiving
complaints from several managers about how appellant treated them and others.  Ridley
received similar complaints.  For example, Wallis cried while complaining to
Henderson about how appellant had treated her.  Norman and Peggy Barlow also
complained to Henderson.  Norman and Barlow eventually resigned in 2005,[3]
and two other managers transferred away from appellant, including Wallis, who
transferred to Waco.  Mike Perez, who took Wallis’s position after she
transferred, told Henderson that he was “very upset about how [appellant]
behaved in the workplace.”  Appellant had led a meeting in which she and other
managers had criticized Perez’s job performance.

          Henderson
told Ridley about the unrest in appellant’s department, and Ridley became
concerned about employee turnover in the department.  In 2005, Carter BloodCare
assigned appellant to work only in the collection training department rather
than the donor collections department.  Appellant’s title changed from director
of donor collections to director of procedure development and training.  The
reassignment gave appellant fewer employees to manage and sometimes allowed her
to work less hours per week, but Carter BloodCare did not reduce her salary.  Ridley,
who is older than appellant, assumed responsibilities related to the donor collections
department.  According to appellant, she tried to meet with Ridley about the
reassignment, but he would not do so, and he was “cold” toward her.  Appellant
did not complain in 2005 that the reassignment had occurred because of her age.

          In
approximately August 2005, appellant began reporting to Michelle Stefan, who
was another senior director, and different employees reported to appellant.  According
to appellant, she and Stefan met with each other “infrequently” because of
Stefan’s “lack of effort.”  Parts of appellant’s deposition indicate, however,
that appellant and Stefan communicated regularly in August and September 2005
and that Stefan organized monthly lunch meetings.

          Stefan
conducted 360-degree reviews of her subordinates.  During these reviews,
employees who reported to or interacted with the reviewed employee submitted
written comments about the reviewed employee’s strengths and weaknesses.  A
document titled “Summary of 360-Degree Feedback for Leslie Burton – 2005,”
which was compiled by Stefan in 2006, reveals that some of Carter BloodCare’s
employees had positive things to say about appellant’s 2005 performance, while
others complained about her communication skills, flexibility, demeanor,
tendency to shift blame, threatening behavior, lack of organization, and
failure to create an “atmosphere of cohesiveness.”  One employee commented that
appellant had “many capabilities which are tempered by her attitude . . . . 
She needs to work on exemplifying teamwork and an even temper[.]”  Another
employee, however, called appellant a “great leader who cares for each employee
and shows it.”  Yet another commenter stated, “[Appellant] constantly does
things to bring this department together as a team.”  The document also stated
that appellant would “need to continue to overcome the perceptions of
staff/coworkers that she is unapproachable.”  Finally, the document stated,

[Appellant] did receive some unfavorable scores and
feedback from coworkers/peers on the 360-degree reviews.  There is a perception
held by some that she is difficult to work with and is not working on
developing teamwork between departments.  This is a perception that [appellant]
will need to understand and recognize as she moves forward.  [I]t will be
critical for her to work on changing this perception and improving her
communication and teambuilding skills.

Stefan
and appellant discussed the negative comments that Stefan had received about
appellant.  Appellant believed that employees who had completed the survey
“took it as an opportunity to document and say mean and gossipy and untrue
things.”  Appellant promised to improve her performance.

          High
turnover for employees who worked under appellant’s supervision continued after
appellant’s 2005 transfer; according to Henderson, between 2005 and 2008,
several employees who reported to appellant transferred or resigned.  In 2007,
Henderson received a complaint about appellant from an employee in the
collection training department; the employee called appellant “harsh,” “confrontational,”
and “hostile.”

          In
2008, Carter BloodCare reassigned appellant to lead a newly created technical
writing department, and Carter BloodCare assigned Sallie Tinney, who is approximately
five years older than appellant, to lead the collection training department.[4] 
In the new department, appellant hired her own subordinates, as she had in the
other departments that she had worked in; one of these new employees was Helen
Serrano.  According to Stefan, appellant’s age had no relation to the
reassignment.

          Appellant
again had fewer employees to manage based on the transfer, but Carter BloodCare
still did not reduce her pay.  Stefan “envisioned that, as a director over a
newly created procedure development department, [appellant] would work in an
area of her strength . . . .  In the newly created procedure development department,
she would have fewer employees to manage and hopefully fewer employee
complaints and less employee unrest.”  Respondents to a 2008 360-degree survey
said, however, that appellant was unprofessional; often spoke poorly of others;
was moody, childish, and difficult to work with; and had “no grasp of
consistency.”[5]  Also, in January 2009,
Serrano complained about how appellant was treating her.

          In
February 2009, Carter BloodCare hired EPS, a human resources consulting company,
to investigate the complaints against appellant.  According to Stefan, appellant
had previously complained that Stefan made direct contact with appellant’s
staff, so hiring EPS “accommodated [appellant’s] wish that [Stefan] refrain
from personal direct contact.”  In a letter sent by EPS to Henderson, EPS
stated that Susan Sorrells, a “Senior Consultant,” would investigate the
complaint on behalf of EPS.  Sorrells considered herself to be an independent
contractor of EPS.

          Henderson
and Stefan met with Sorrells and told her about Serrano’s complaint and issues
pertaining to appellant’s interactions with Carter BloodCare’s employees.  Henderson
allowed Sorrells to review appellant’s and Serrano’s personnel files.  Sorrells,
who is a nonpracticing attorney, interviewed many Carter BloodCare employees,
including appellant, in a vacant room within the human resources department.  Numerous
employees made negative comments to Sorrells about various aspects of
appellant’s job performance.  One employee told Sorrells that working with
appellant was “like working in a bomb factory.”  Some employees called Sorrells
after the interviews concluded to talk more about appellant.

          According
to appellant, she believed before her meeting with Sorrells that the meeting
was to be part of a general employee survey about Carter BloodCare’s strengths
and weaknesses.  But when the three-hour meeting occurred, Sorrells was,
according to appellant, aggressive, unrelenting, and insulting.  Appellant
described her meeting with Sorrells as an “interrogation” and said that she
felt confined, restricted, and overwhelmed.  Sorrells, however, believed that
she had asked open-ended questions that appellant had difficulty answering
because appellant did not want to “face what other people were saying about
her.”

          After
Sorrells completed her investigation, she presented a verbal report to
Henderson, Stefan, Bob Grigsby (Carter BloodCare’s chief operating officer),
and Dr. Merlyn Sayers (the company’s chief executive officer).  According to
Henderson and Grigsby, Sorrells’s report indicated there had been substantial
employee unrest focused around appellant’s behavior in the workplace.  Sorrells
was not asked for her opinion about whether appellant should be fired, but after
a meeting attended by Henderson, Stefan, Grigsby, and Dr. Sayers, Carter
BloodCare terminated appellant’s employment in March 2009, when she was in her
late fifties.  According to affidavits filed by Henderson, Stefan, Grigsby, and
Dr. Sayers, their decision to discharge appellant had nothing to do with her
age; rather, the decision was based on appellant’s workplace behavior.  From
being fired until her deposition in January 2010, appellant was unable to find
suitable employment in the blood banking industry.

          Appellant
filed a charge of discrimination against Carter BloodCare, alleging that the
termination of her employment “was preceded by disparate treatment on the
ground of age.”  Appellant then sued appellees.  She alleged a false
imprisonment claim against all appellees (based on the interview she had with Sorrells);
defamation, invasion of privacy,[6] and an age discrimination
claim against only Carter BloodCare; and an intentional infliction of emotional
distress claim against only EPS and Sorrells.  Appellant asked for actual and
punitive damages.

          Carter
BloodCare filed traditional and no-evidence motions for summary judgment
against all of the claims appellant had asserted against it.  EPS and Sorrells
also jointly filed traditional and no-evidence motions for summary judgment on
appellant’s claims against them.  Appellant responded to the motions.  Carter
BloodCare objected to appellant’s responses on the ground that she had raised a
breach of contract claim for the first time in them and had attached her own
deposition testimony that was, in part, conclusory, without foundation, and
based on hearsay.  EPS and Sorrells filed a motion to strike parts of
appellant’s summary judgment evidence for similar reasons.  Appellant responded
to Carter BloodCare’s objections and Sorrells and EPS’s motion to strike.  The
trial court sustained all of appellees’ evidentiary objections and granted
appellees’ motions for summary judgment.  Appellant brought this appeal.

Summary
Judgment Standards

          We
review a summary judgment de novo.  Travelers Ins. Co. v. Joachim, 315
S.W.3d 860, 862 (Tex. 2010).  We consider the evidence presented in the light
most favorable to the nonmovant, crediting evidence favorable to the nonmovant
if reasonable jurors could, and disregarding evidence contrary to the nonmovant
unless reasonable jurors could not.  Mann Frankfort Stein & Lipp
Advisors, Inc. v. Fielding, 289 S.W.3d 844, 848 (Tex. 2009).  We indulge
every reasonable inference and resolve any doubts in the nonmovant’s favor.  20801,
Inc. v. Parker, 249 S.W.3d 392, 399 (Tex. 2008).  We must consider whether
reasonable and fair-minded jurors could differ in their conclusions in light of
all of the evidence presented.  See Wal-Mart Stores, Inc. v. Spates, 186
S.W.3d 566, 568 (Tex. 2006); City of Keller v. Wilson, 168 S.W.3d 802,
822–24 (Tex. 2005).

          When
a party moves for both a traditional and a no-evidence summary judgment, we
generally first review the trial court’s summary judgment under no-evidence
standards.  See Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 600 (Tex.
2004); All Am. Tel., Inc. v. USLD Commc’ns, Inc., 291 S.W.3d 518, 526
(Tex. App.—Fort Worth 2009, pet. denied).  “When the trial court does not
specify the basis for its summary judgment, the appealing party must show it is
error to base it on any ground asserted in the motion.  The appellate court
must affirm the summary judgment if any one of the movant’s theories has
merit.”  Star-Telegram, Inc. v. Doe, 915 S.W.2d 471, 473 (Tex. 1995)
(citations omitted).

          In
a traditional summary judgment case, the issue on appeal is whether the movant
met the summary judgment burden by establishing that no genuine issue of
material fact exists and that the movant is entitled to judgment as a matter of
law.  Tex. R. Civ. P. 166a(c); Mann Frankfort, 289 S.W.3d at 848.  If uncontroverted
evidence is from an interested witness, it does nothing more than raise a fact
issue unless it is clear, positive and direct, otherwise credible and free from
contradictions and inconsistencies, and could have been readily controverted. 
Tex. R. Civ. P. 166a(c); Morrison v. Christie, 266 S.W.3d 89, 92 (Tex.
App.—Fort Worth 2008, no pet.).

          After
an adequate time for discovery, the party without the burden of proof may,
without presenting evidence, move for summary judgment on the ground that there
is no evidence to support an essential element of the nonmovant’s claim or
defense.  Tex. R. Civ. P. 166a(i).  The motion must specifically state the
elements for which there is no evidence.  Id.; Timpte Indus., Inc. v.
Gish, 286 S.W.3d 306, 310 (Tex. 2009).  The trial court must grant the
motion unless the nonmovant produces summary judgment evidence that raises a
genuine issue of material fact.  See Tex. R. Civ. P. 166a(i); Hamilton
v. Wilson, 249 S.W.3d 425, 426 (Tex. 2008).  If the nonmovant brings
forward more than a scintilla of probative evidence that raises a genuine issue
of material fact, then a no-evidence summary judgment is not proper.  Smith
v. O’Donnell, 288 S.W.3d 417, 424 (Tex. 2009); King Ranch, Inc. v.
Chapman, 118 S.W.3d 742, 751 (Tex. 2003), cert. denied, 541 U.S.
1030 (2004).

Age
Discrimination

          In
her first issue, appellant argues that the trial court erred by granting
summary judgment for Carter BloodCare on her age discrimination claim.  In her
pleading, appellant contended that she could prevail on her age discrimination
claim under the labor code because she was demoted twice while younger peers in
similar circumstances were not, subjected to various work conditions while
younger peers in similar circumstances were not, and fired when there was not a
legitimate, nondiscriminatory reason for doing so.  Carter BloodCare sought
summary judgment on traditional and no-evidence grounds.

          An
employer commits an unlawful employment practice if, because of age, the
employer discharges an individual or discriminates against an individual in
connection with compensation or the terms, conditions, or privileges of
employment.  Tex. Labor Code Ann. § 21.051(1) (West 2006);[7]
Davis v. City of Grapevine, 188 S.W.3d 748, 767 (Tex. App.—Fort Worth
2006, pet. denied).  An unlawful employment practice is generally established
when a plaintiff demonstrates that age “was a motivating factor for an
employment practice, even if other factors also motivated the practice.”  Tex.
Labor Code Ann. § 21.125(a) (West 2006).  But in the “absence of other evidence
of an unlawful employment practice, evidence of the employment of one person in
place of another is not sufficient to establish an unlawful employment practice.” 
Id. § 21.061 (West 2006).

          In discrimination
cases that have not been fully tried on the merits and in which the plaintiff
alleges that the employer’s stated reason for an adverse action was a pretext
for discrimination (as appellant has here), we apply the McDonnell Douglas
burden-shifting scheme.  See McDonnell Douglas Corp. v. Green, 411 U.S.
792, 802–04, 93 S. Ct. 1817, 1824–25 (1973); Wal-Mart Stores, Inc. v.
Canchola, 121 S.W.3d 735, 739 (Tex. 2003); Hernandez v. Grey Wolf
Drilling, L.P., 350 S.W.3d 281, 284 (Tex. App.—San Antonio 2011, no pet.); Ptomey
v. Tex. Tech Univ., 277 S.W.3d 487, 492 (Tex. App.—Amarillo 2009, pet.
denied).  As we explained in Davis, 

Under this framework, the plaintiff must first
demonstrate a prima facie case of discrimination,[[8]]
and if the plaintiff is successful, the burden of production shifts to the
defendant employer to show a legitimate and non-discriminatory basis for the
adverse employment decision.  If the defendant employer demonstrates a
non-discriminatory reason for its employment action, the plaintiff must show
that the defendant’s proffered reason is merely a pretext.

188
S.W.3d at 767 (citation omitted); see Hernandez, 350 S.W.3d at 284; Ptomey,
277 S.W.3d at 492–93; see also Jackson v. Cal-W. Packaging Corp., 602
F.3d 374, 378 (5th Cir. 2010) (stating that the Fifth Circuit applies the McDonnell
Douglas framework to age discrimination cases).  A plaintiff may show
pretext by showing that the employer’s explanation for the employment action is
unworthy of credence.  Ptomey, 277 S.W.3d at 493 (citing Tex. Dep’t
of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095
(1981)).

          Carter
BloodCare sought summary judgment on the basis that appellant had no evidence
of a prima facie case of age discrimination.  To prevail against Carter
BloodCare’s no-evidence motion, appellant was required to produce more than a
scintilla of evidence that she is in the protected class (meaning that she is at
least forty years old),[9] was discharged (or
suffered another ultimate adverse employment action, such as a reduction in compensation),[10]
was qualified for the position from which she was discharged, and was replaced
by someone under forty, replaced by someone younger, or was otherwise
discharged because of age.  See Hernandez, 350 S.W.3d at 284; Ptomey,
277 S.W.3d at 492; Davis, 188 S.W.3d at 767.  The establishment of such
a prima facie case is a condition precedent to a pretext analysis.  Jones v.
Union Pac. R.R. Co., 302 F.3d 735, 741 (7th Cir. 2002).

          We
agree with appellant that she presented more than a scintilla of evidence that
she was over 40 years old when she was discharged from a position that she had
been qualified for.  We must still determine, however, whether she presented
more than a scintilla of evidence that she was replaced by someone under forty,
replaced by someone younger, or was otherwise discharged because of age.  Appellant
did not present evidence that she was replaced by someone under forty or
younger than she was, so she must show that she was “otherwise discharged
because of [her] age.”  Davis, 188 S.W.3d at 767.  In an attempt to
establish this fact, appellant relies on the following allegations:  “age[-]biased
statements were made” by her supervisors, and she was treated differently in
“numerous aspects of . . . supervision” than her younger peers.

Alleged
ageist comments

          Ridley
allegedly made the first age-biased statement upon which appellant relies.  During
her deposition, appellant testified that Ridley had made a comment “that it was
the intent of Carter BloodCare to hire a younger management team because we
were all getting older and we wouldn’t be there for long.”  Appellant said that
Ridley made this comment three to five times, but she conceded that the comment
was made in reference to hiring decisions.  Appellant also recognized that Ridley
was not in her chain of command and had not been her boss for several years when
Carter BloodCare fired her.  Stefan allegedly made a second age-biased
statement.  Specifically, appellant testified that Stefan had made a comment,
after forgetting something that she had planned to do, “that because she was
over 40 she guessed she was getting too old.”

          For
two reasons, Ridley’s and Stefan’s alleged comments are inadequate to show that
appellant was discharged because of her age.  First, Carter BloodCare objected
in the trial court to the admissibility of the alleged comments, asserting that
they were irrelevant and lacked foundation.  While appellant relies on Ridley’s
and Stefan’s alleged statements, she has not expressly argued that the trial
court abused its discretion by sustaining Carter BloodCare’s objection and
excluding them.  “Where evidence has been held to be inadmissible and that
holding has not been challenged on appeal, this court cannot consider the
excluded evidence.”  Frazier v. Yu, 987 S.W.2d 607, 610 (Tex. App.—Fort
Worth 1999, pet. denied); Rhodes v. Interfirst Bank Fort Worth, N.A., 719
S.W.2d 263, 265 (Tex. App.—Fort Worth 1986, no writ).

          Second,
even if we were to consider the comments, they are insufficient to raise a fact
issue concerning discrimination.  In Jackson, the Fifth Circuit
considered the effect of an alleged comment from an employer’s chief operating
officer that Jackson, who had brought an age discrimination claim, was an “old,
gray-haired fart.”  602 F.3d at 380.  The Fifth Circuit decided that the
statement had no probative value and explained that comments are evidence of
discrimination only if they are  

1) related to the protected class of persons of which the
plaintiff is a member; 2) proximate in time to the complained-of adverse
employment decision; 3) made by an individual with authority over the
employment decision at issue; and 4) related to the employment decision at
issue. . . .  Comments that do not meet these criteria are considered “stray
remarks,” and standing alone, are insufficient to defeat summary judgment.

          While [the chief operating officer’s] alleged
comment meets the first and third criteria, Jackson has provided no evidence
that the comment was proximate in time to his firing or related to the employment
decision at issue. . . .  The comment appears wholly unrelated to Jackson’s
termination, and Jackson has not presented any evidence to show otherwise.

Id.
(footnotes and citations omitted); see also Rubinstein v. Adm’rs of Tulane
Educ. Fund, 218 F.3d 392, 400–01 (5th Cir. 2000) (holding that in a
plaintiff’s claim of discrimination based on his national origin, comments that
he was a “Russian Yankee” and a “Russian Jew” were insufficient to defeat the
employer’s motion for summary judgment because the comments were not proximate
in time to the plaintiff’s failure to receive raises or promotions, and the
comments were therefore “stray remarks”), cert. denied, 532 U.S. 937
(2001).  Texas courts take the same approach regarding “stray remarks” as the Fifth
Circuit.  See AutoZone, Inc. v. Reyes, 272 S.W.3d 588, 592 (Tex. 2008)
(“We have held that stray remarks are insufficient to establish discrimination
and statements made remotely in time by someone not directly connected with
termination decisions do not raise a fact issue about the reason for
termination.”); Niu v. Revcor Molded Products Co., 206 S.W.3d 723, 729–30
(Tex. App.—Fort Worth 2006, no pet.) (holding that a comment made eight months
before a termination decision was not proximate enough in time to be probative
of discrimination).

          In
her deposition, appellant dated Ridley’s alleged comment about intending to
hire a younger management team as occurring “very early in [her] career.”  She
admitted that Ridley was referring to hiring decisions in the context of
filling open vacancies, and she said that he explained that he and other
employees would “be retiring soon.”  Appellant admitted that Ridley was not in
her chain of command when she was fired, and appellant did not present evidence
showing that Ridley had any influence on Carter BloodCare’s decision to fire
her.  Thus, because of proximity of time, Ridley’s apparent lack of authority
over the decision to fire appellant, and the fact that Ridley’s comment was
focused on hiring and retiring rather than firing, we hold that Ridley’s
alleged comment is no evidence to support a prima facie case of
discrimination.  For similar reasons, we conclude that Stefan’s comment,
which was made, according to appellant, “at one point,” had nothing to do with
managing employees, and had nothing to do with appellant but was rather focused
on Stefan herself feeling old, cannot raise a fact issue on
discrimination.

Alleged
disparate treatment

          Appellant
contends that there were “numerous instances of disparate treatment . . . ,
including an involuntary demotion and numerous aspects of . . . supervision . .
. to which younger peers were not subject.”  Appellant said in her deposition
that

·       
when
she changed departments in 2005, she was being treated differently than “younger
employees that had similar allegations and problems with the company,” such as
Debbie Liles, who had allegedly micromanaged, embarrassed, and disrespected an
employee but was not demoted or terminated (although appellant did not know
whether anyone complained to human resources or upper management about Liles’s
behavior);

 

·       
Henderson
“had personnel problems” with a long-term employee and was not demoted,
counseled, reprimanded, or placed in a smaller office, as appellant had been;

 

·       
Jacalyn
Biersmith had “difficult” working relationships with her employees without
consequences; and

 

·       
Norman
had some “personnel issues” and “questionable behavior,” and nothing happened
to Norman “to [appellant’s] knowledge.”[11]

Appellant
admitted, however, that she did not know for a fact that Henderson, Liles,
Norman, or Biersmith were younger than she was.  Appellant also testified that Stefan,
among other alleged faults, could not relate to appellant because of
appellant’s age; isolated appellant from meetings while not isolating
appellant’s younger peers; did not diligently address criticism with appellant
like she did with appellant’s younger peers; denied equivalent space or
administrative support that was provided to appellant’s younger peers; and was
more animated, friendly, and communicative with younger employees.

          Carter
BloodCare objected to the portions of appellant’s deposition when she discussed
the alleged lack of comparable discipline for younger employees (Liles,
Henderson, Biersmith, and Norman).  The objections asserted that appellant’s
testimony was without foundation, irrelevant, and speculative since she had no
personal knowledge of the ages or birthdays of her peers and because appellant
did not show that her own circumstances were sufficiently comparable to the
younger employees’ situations.  The trial court sustained the objections, and
appellant’s original briefing did not challenge that decision.  Thus, we
conclude that we cannot consider that evidence.[12] 
See Frazier, 987 S.W.2d at 610. 

          But
even if we were to consider the evidence, we would conclude that it fails to
raise a genuine issue of material fact about whether appellant was discharged
because of her age.  The following exchange occurred during appellant’s
deposition:

          Q.  . . .  [W]hen you say [Henderson’s] younger
than you, what do you base that on?

          A.  I have no basis of fact.

          . . . .

          Q.  Do you know for a fact [Biersmith’s]
younger than you?

          A.  Not for a fact.

          Q.  Okay.

          A.  Nor Debbie Liles, nor Brandye Norman.

Because
appellant did not produce more than a scintilla of evidence that the employees
whom she used for disparate treatment comparisons were actually younger than
she was, much less significantly younger than she was, she cannot rely on the
comparisons to show age-related discriminatory conduct.  See Acosta v. Gov’t
Emps. Credit Union, 351 S.W.3d 637, 643–44 (Tex. App.—El Paso 2011, no pet.);
see also Hartis v. Mason & Hanger Corp., 7 S.W.3d 700, 705 (Tex.
App.—Amarillo 1999, no pet.) (“[W]hen one attempts to establish a prima facie
case of age discrimination under section 21.051 by comparing his treatment with
that of a younger individual, the difference in age between the two must be
significant.”) (citing O’Connor v. Consol. Coin Caterers Corp., 517 U.S.
308, 313, 116 S. Ct. 1307, 1310 (1996)).[13]

          Appellant
also relies on her alleged “involuntary demotion” in an attempt to prove
disparate treatment.  But as we have discussed above, appellant did not present
nonexcluded evidence that she was transferred to different departments within
Carter BloodCare while similarly situated and significantly younger employees
were not.[14]  Moreover, the evidence
establishes that older employees assumed appellant’s responsibilities once she
was transferred from her old positions to new ones.  Thus, we hold that
appellant’s transfers do not raise a genuine fact issue of age discrimination.

          Finally,
in her brief, appellant argues, “There were also numerous instances of
disparate treatment . . . including . . . numerous aspects of the supervision
of [appellant] to which younger peers were not subject.”  In her statement of
facts, appellant directs us to her deposition testimony, in which she stated
that Stefan treated her differently than younger employees because unlike
Stefan’s interactions with those employees, Stefan allegedly refused to meet
with appellant,[15] failed to respond
promptly to her, excluded her from meetings, isolated her, did not celebrate
her birthday, did not properly coach or train her, did not provide periodic
performance evaluations, denied her administrative support, denied her a
director’s office and eventually placed her in a cubicle, and solicited false
and negative comments about her.  Again, however, the trial court sustained
Carter BloodCare’s objection to appellant’s testimony about how Stefan had
treated her as compared to younger peers, and since appellant has not expressly
appealed that ruling, we cannot consider the evidence.  See Frazier,
987 S.W.2d at 610.  Moreover, as the Beaumont Court of Appeals recently
explained in a case where a plaintiff attempted to use other employees’
inappropriate conduct to prove disparate treatment for his own misconduct and therefore
raise an inference of discrimination,

“To prove discrimination based on disparate discipline,
the disciplined and undisciplined employees’ misconduct must be of ‘comparable
seriousness.’”  Precise equivalence in culpability is not required, but a
plaintiff must usually show that the misconduct for which he was discharged was
nearly identical to the conduct engaged in by an employee whom the company
retained.  

Flores
v. City of Liberty, 318 S.W.3d 551, 556 (Tex. App.—Beaumont
2010, no pet.) (citations omitted); see Reyes, 272 S.W.3d at 593–95
(applying the comparable seriousness/nearly identical disparate treatment standard);
Ysleta Indep. Sch. Dist. v. Monarrez, 177 S.W.3d 915, 917–18 (Tex. 2005)
(same); Herbert v. City of Forest Hill, 189 S.W.3d 369, 376 (Tex. App.—Fort
Worth 2006, no pet.) (“More favorable treatment of a person outside a protected
class can be used to show discrimination only if the circumstances are nearly
identical.”).  In other words, as the Fifth Circuit has explained, 

Employees with different supervisors, who work for
different divisions of a company or who were the subject of adverse employment
actions too remote in time from that taken against the plaintiff generally will
not be deemed similarly situated.  Likewise, employees who have different work
responsibilities or who are subjected to adverse employment action for
dissimilar violations are not similarly situated.  This is because we require
that an employee who proffers a fellow employee as a comparator demonstrate
that the employment actions at issue were taken “under nearly identical
circumstances.”  The employment actions being compared will be deemed to have
been taken under nearly identical circumstances when the employees being
compared held the same job or responsibilities, shared the same supervisor or
had their employment status determined by the same person, and have essentially
comparable violation histories. . . .  If the “difference between the
plaintiff's conduct and that of those alleged to be similarly situated accounts
for the difference in treatment received from the employer,” the employees
are not similarly situated for the purposes of an employment discrimination
analysis.

Lee
v. Kan. City S. Ry. Co., 574 F.3d 253, 259–60 (5th Cir. 2009) (citations
and footnotes omitted).

          Even
if the evidence had been admitted to show that Stefan treated appellant
differently than other employees who worked under Stefan’s authority, we
conclude, based on our review of appellant’s deposition, that she did not
present more than a scintilla of evidence to demonstrate that she was similarly
situated to those other employees or was significantly older than them.  For
that reason as well, we conclude that appellant failed to raise a genuine issue
of material fact about the fourth prima facie element of age discrimination: 
that she was discharged because of her age.

          Because
appellant has not directed us to more than a scintilla of admitted evidence
that supports a prima facie case for age discrimination under chapter
twenty-one of the labor code, we hold that the trial court did not err by
granting Carter BloodCare’s no-evidence motion for summary judgment against
that claim.  See Tex. R. Civ. P. 166a(i); Hamilton, 249 S.W.3d at
426.  We overrule appellant’s first issue.

False
Imprisonment

          In
her second issue, appellant asserts that the trial court erred by granting
appellees’ motions for summary judgment on her false imprisonment claim.  Each
appellee moved for summary judgment on appellant’s false imprisonment claim on traditional
and no-evidence grounds.

The requirement
of a willful detention

          To
defeat appellees’ no-evidence summary judgment motions, appellant was required
to produce more than a scintilla of evidence of a willful detention that was without
consent and was without the authority of law.  Dangerfield v. Ormsby,
264 S.W.3d 904, 909 (Tex. App.—Fort Worth 2008, no pet.); see Wal-Mart
Stores, Inc. v. Rodriguez, 92 S.W.3d 502, 506 (Tex. 2002); Randall’s
Food Mkts., Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex. 1995).  “[L]iability
for false imprisonment extends beyond those who willfully participate in
detaining the complaining party to those who request or direct the detention.” 
Dangerfield, 264 S.W.3d at 909–10; see Rodriguez, 92 S.W.3d at
507.  

          The
first element of false imprisonment, a willful detention, 

may be accomplished by violence, by threats, or by any
other means that restrains a person from moving from one place to another.  Where
it is alleged that a detention is effected by a threat, the plaintiff must
demonstrate that the threat was such as would inspire in the threatened person
a just fear of injury to her person, reputation, or property.

Johnson,
891 S.W.2d at 645 (citation omitted); see Rodriguez, 92 S.W.3d at 511
(“[F]alse imprisonment is an intentional tort, requiring a willful detention by
the defendant.”).

          In
Johnson, Johnson, a store’s manager, had failed to pay for a Christmas
wreath when leaving the store.  891 S.W.2d at 643.  When Johnson returned to
work two days later, the store’s director, Lewis Simmons, escorted her to an
office and questioned her about the wreath; Johnson admitted to not paying for
the wreath, and Simmons called the store’s district manager, Mike Seals.  Id. 
Because Seals wanted to meet with Johnson later that day, Simmons asked her to
stay at the store but suggested that she stay in the office or work on a volunteer
project.  Id.  Johnson generally stayed in the office, although she left
it twice while waiting for Seals to arrive.  Id.  When he did so, he and
Simmons questioned Johnson further, which caused her to cry, and then Seals
suspended Johnson for thirty days.  Id.  Johnson sued the store, Seals,
and Simmons for false imprisonment under the theories that Simmons had detained
her by sternly insisting that she stay put while waiting for Seals and that he
had restricted her from entering areas of the store.  Id. at 645.  The
supreme court concluded that Johnson had not been willfully detained, stating
in part,

          Simmons’ request that Johnson not work in one
area of the workplace does not constitute false imprisonment.  When an employer
supervises its employees, it necessarily temporarily restricts the employees’
freedom to move from place to place or in the direction that they wish to go.  Without
more, however, such a restriction is not a “willful detention.”  An employer
has the right, subject to certain limited exceptions, to instruct its employees
regarding the tasks that they are to perform during work hours. . . .  In order
to effectively manage its business, an employer must be able to suggest, and
even insist, that its employees perform certain tasks in certain locations at
certain times.  As a matter of law, [the store] did not falsely imprison
Johnson.

Id. at
645–46 (citations and footnotes omitted).  The court distinguished cases in
which threats had been made to an employee’s person, reputation, or property.  See
id. at 645 n.4; see also Grant v. Stop-N-Go Mkt. of Tex., Inc., 994
S.W.2d 867, 870–72 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (concluding
that the evidence raised a fact issue on false imprisonment when a store’s
manager, who suspected the plaintiff of stealing, grabbed the plaintiff’s arm,
told him to “shut up” and to not leave, and called the police, which resulted
in the plaintiff’s trip to a police station); Black v. Kroger Co., 527
S.W.2d 794, 796–97, 800–01 (Tex. Civ. App.—Houston [1st Dist.] 1975, writ dism’d)
(holding that a jury could reasonably find false imprisonment based on an
inability to exercise free will to leave an interview room when the plaintiff
was threatened with being taken to jail and with not seeing her daughter for a
long time if she did not admit to stealing money); Kroger Co. v. Warren,
420 S.W.2d 218, 220–22 (Tex. Civ. App.—Houston [1st Dist.] 1967, no writ)
(upholding the trial court’s finding of false imprisonment when the plaintiff
was told that she could not leave the room until she signed a statement and was
physically restrained when she attempted to leave).

          We
have also had an occasion to hold, as a matter of law, that evidence did not
support a false imprisonment claim.  See Safeway Stores, Inc. v. Amburn,
388 S.W.2d 443, 447 (Tex. Civ. App.—Fort Worth 1965, no writ).  Kenneth Amburn
had been working at a Safeway Store when R.C. Newman, a district manager, led
him to a secluded area at the back of the store to speak to an independent
investigator, Bill Koch, about Amburn’s alleged stealing.  Id. at 444–45. 
Without telling Amburn that he had to remain in the area or using physical
force to restrain him, Koch interviewed Amburn for thirty to forty minutes;
Amburn had the physical ability to leave the area but did not attempt to do so
or indicate a desire to do so.  Id. at 445.  Koch told Amburn that there
was evidence to send Amburn to a penitentiary and that “the salary in
Huntsville for checkers was not very good.”  Id.  Eventually, Amburn
signed a document in which he admitted stealing money.  Id.  Amburn sued
the store for false imprisonment, alleging that he was “overawed and
intimidated, frightened to the extent of being incapable of exercising his will
in removing himself, and thereby prevented from leaving said place in said
store where he was thus held and willfully and maliciously detained . . .
against his will.”  Id. at 445–46.  We reversed the trial court’s
judgment in Amburn’s favor and rendered judgment against him, stating,

[T]his case raises the question of the limitations
imposed upon an employer in discussing with an employee matters relevant to his
employment.  We think an employer is entitled to discuss with his employees all
matters bearing upon the duties and purposes attendant to the employment . . . .
 We also think the employee is entitled to be forthwith confronted with such
information and that the logical place for such a conference would be in the
establishment where the employee is hired to work.  It is possible, o[f]
course, for such an interview to be held at an improper place and conducted in
an improper manner.  From a careful review of the record, however, we do not
believe this to be the case as far as Amburn is concerned. The conference with
Amburn was conducted in the regular place of business by one whose duty it was
to investigate such matters.  The area was sufficient to accommodate the
presence of the persons involved.  No threats or physical efforts were made to
restrain Amburn.  He was at all times free to leave.  There was no impediment
to restrain Amburn from removing from one place to another.

          We do not approve of the conduct of Koch.  Such
conduct, however, bears only upon the value of Amburn’s confession . . . .  It
has nothing to do with whether he was falsely imprisoned.  The confession
. . . may have been made because Amburn feared that he would be sent to the
penitentiary . . . .  This fact may have rendered the confession . . . involuntary.
 It did not render Amburn’s presence in the area of interrogation false
imprisonment.

          While employers should be admonished that their
dealing with employees should always be reasonable and humane, we cannot adopt
a rule which would constantly place an employee in jeopardy of a charge of
false imprisonment.  The interview with Amburn had a direct bearing upon his
duties as an employee.  He was compensated during the time that he was in the
area.  Under the circumstances, it cannot be said that his requested presence
for purposes of interrogation constituted false imprisonment unless he was
unlawfully detained.  We accept at face value Amburn’s testimony that he was
scared.  It is not unlikely that any person being confronted with questions
concerning his personal integrity would relish such an interview.  This,
however, is not the same as false imprisonment.

          . . . .

          . . .  The threat which is alleged to have
resulted in false imprisonment must be calculated to detain the person.  It
must result in more than intimidation if one can, by ordinary means, relieve
himself from any restraint or detention.

Id. at
446–47 (emphasis added); see also Morales v. Lee, 668 S.W.2d 867, 869
(Tex. App.—San Antonio 1984, no writ) (concluding that there was no evidence of
false imprisonment although a defendant screamed at his employee in the
defendant’s office, told her not to leave, and told her that if she did leave, he
would call the police). 

          A
year before deciding Amburn, we decided, under distinct facts, that a
jury could have justifiably found some evidence of false imprisonment. See Skillern
& Sons, Inc. v. Stewart, 379 S.W.2d 687, 690 (Tex. Civ. App.—Fort Worth
1964, writ ref’d n.r.e.).  Stewart had been working for a drug store when she
was accused of stealing and was asked to go to a meeting.  Id. at 688–89.
The investigator told Stewart that she could not leave until she wrote a
statement that she had stolen money and merchandise, told her that she was
going to the penitentiary, and physically restricted her from getting up from a
table.  Id. at 689–90. 

Application
of law to facts

          Carter
BloodCare hired EPS in February 2009 because, in part, the company was
concerned that it had high employee turnover.  EPS independently contracted
with Sorrells, who, by the time of her deposition, had conducted seventy to
eighty employee investigations.  Sorrells met with Carter BloodCare’s officials
about a complaint made by Serrano, one of Carter BloodCare’s technical writers,
against appellant.  The officials gave Sorrells several names of individuals
who had previous issues with appellant, and the officials allowed Sorrells to
review Serrano’s and appellant’s personnel files.  Serrano told Sorrells that
there was “abuse from [appellant].”  Serrano also said that she wanted to find
somewhere else to work in Carter BloodCare because she was “afraid of
[appellant’s] backlash.”  Sorrells also interviewed other employees, including
Willis, who told Sorrells that appellant “had told the technical writers,
[‘]I’ll destroy anyone who challenges me.[’]”  Willis told Sorrells that Willis
was scared because appellant’s behavior was erratic.

          Before
appellant’s meeting with Sorrells in an office at Carter BloodCare, appellant
had recently used the same office to conduct an employee’s performance review. 
Sorrells described the room where she interviewed appellant as a 

vacant office.  It’s obvious that it’s nobody’s current
office.  It has a little bit of storage . . . either boxes or shelves. . . . 
[It has] a desk, two chairs.  I recall that there’s a phone.  And I don’t
recall there being much else as far as supplies or anything of that nature . .
. .  [T]he office was very comfortable for two people.

          At
the beginning of the interview, Sorrells closed the door of the office where
she and appellant sat.  According to Sorrells, she did so to keep the
conversation private.  Appellant sat as close to the door as Sorrells did.

          Sorrells
introduced herself as a nonpracting attorney, told appellant that she was not
recording the conversation, and ensured that appellant was also not doing so.  Sorrells
also told appellant that the interview would be “confidential to the extent
possible” but that she would report the results of the interview to Carter
BloodCare’s officials.  Sorrells warned appellant that she could be disciplined
for discussing the interview with others.

          Sorrells
interviewed appellant for about three hours (she had met with Carter
BloodCare’s other employees from thirty minutes to two hours).  During that
time, appellant did not ask for a bathroom break.  Sorrells never touched appellant
or threatened to do so.  But according to appellant, Sorrells’s tone “became
agitated and frustrated at certain points.”  Sorrells asked appellant about
“numerous negative comments” that, according to Carter BloodCare’s employees,
appellant had made.  According to Sorrells, appellant denied making some of the
comments but admitted to “saying some things.”  Appellant testified in a
deposition that Sorrells’s “posture during most of the interrogation was
leaning forward and asking . . . closed-ended, accusatory questions.”  Sorrells
denied conducting the interview with appellant in an aggressive manner and denied
asking leading questions.  Appellant said that Sorrells made her feel “dirty
and worthless and unworthy and embarrassed and shamed and insulted.”  Appellant
believed that she was to meet with Sorrells for an hour-long employee
satisfaction survey, rather than, in appellant’s words, a “three-hour bashing
that left [her] totally degraded, ashamed, devastated, shocked, horrified,
diminished, [and] feeling worthless.”  Appellant said that Sorrells’s
questioning was “unrelenting, repetitive, and shocking.”  She believed that
Sorrells had asked insulting questions, had made insulting comments, and that
Sorrells “had no regard for [appellant’s] discomfort with the questions.”

          Although
appellant stated that she did not believe that she had the authority to leave
the interview with Sorrells because Sorrells was there at Carter BloodCare’s senior
management’s direction, appellant admitted that she never asked or tried to
leave.  Appellant also conceded that she was not told that she was not free to
leave the room.

          Appellant
said that she shared with Sorrells on more than one occasion that she was uncomfortable
in the interview.  She added, “I would not have willingly gone into that
meeting so totally unprepared and surprised by the tone at that meeting.”  She
said, “I object to the fact that I was so . . . humiliated, so insulted, . . .
that I was literally cemented to my seat in shock and horror . . . at what was
going on.”  Sorrells admitted that appellant expressed discomfort during the
interview, and Sorrells stated that appellant seemed surprised by some of the
questions that Sorrells had asked.  According to Sorrells, this was because
appellant “was finding the questions difficult to answer, that it was difficult
for her to face what other people were saying about her.”  Sorrells did not
talk to appellant about favorable comments that had been made about her because
she did not believe that appellant would dispute the favorable comments.

          At
the end of the interview, Sorrells asked appellant whether appellant had
anything else to say, and appellant said that she did not.  Sorrells told
appellant that appellant should not discuss anything that had happened in the
interview with anyone.  Sorrells also gave appellant Sorrells’s business card
and asked appellant if there was anyone that appellant would like her to
contact “to help [appellant’s] case.”  Appellant said that she would “think
about it and get back to her.”  Later, appellant sent Sorrells an e-mail to
provide Sorrells with additional information; in that e-mail, appellant queried
about whether she would have another meeting with Sorrells.  Sorrells responded
that there were no plans for a follow-up meeting.

          Despite
the undisputed evidence that appellant was not physically restrained, was not
told that she had to stay in the interview, and never asked to leave it, she
contends that there are several facts by which we may infer appellees’ willful detention
of her.  First, appellant contends that Sorrells “referred to [appellant] as an
accused individual, and consistent with doing so, admitted asking [appellant]
repeatedly about pejorative comments about her.”  But the record citation
appellant gives for that contention does not establish that Sorrells referred
to appellant as an accused individual at the time of the interview; instead, the
record shows that during her deposition, Sorrells referred generally to issues
related to accused individuals in her investigations.  Appellant also contends
in her brief that false imprisonment may be inferred from the fact that Sorrells
knew of appellant’s “psychological sensitivity” during the interview.  In her
deposition, Sorrells said that during the interview, appellant disclosed that
she had visited a counselor about her prior transfer at Carter BloodCare.  We disagree,
however, with appellant’s assertion that this disclosure should have “led to
the immediate ending” of the interview.  Like in Amburn, what other
Carter BloodCare employees had said about appellant’s workplace behavior, and
how appellant responded to the employees’ accusations, had a direct bearing
upon appellant’s employment, and Carter BloodCare was entitled to investigate
those matters.  See 388 S.W.2d at 446.  Thus, we decline to infer false
imprisonment simply from Sorrells’s asking various difficult questions or from
appellant’s discomfort with the questions.  See id. (“It is not
unlikely that any person being confronted with questions concerning his
personal integrity would relish such an interview.  This, however, is not the
same as false imprisonment.”); see also Morales, 668 S.W.2d at 869.

          Second,
appellant contends that Sorrells admitted to misleading appellant about the
purpose of the interview.  We have found no such admission in the record
references provided by appellant; instead, Sorrells testified that she told
appellant the truth about the purpose of the interview.  Third, appellant
argues that Sorrells “admitted to a different and decidedly more detailed form
of preparation for the interrogation of [appellant] . . . and a much longer
interrogation of [appellant] . . . than any interview of [appellant’s]
subordinates.”  We cannot agree that Sorrells’s level of preparation for the
interview with appellant raises an inference of Sorrells’s intent to detain
appellant.  Nor do we believe that the comparative length of appellant’s
interview to Sorrells’s other interviews creates a fact issue on false
imprisonment; it makes sense that appellant’s interview lasted longer because
it involved questions generated by facts that Sorrells accumulated in many
other interviews.

           We
also disagree with appellant’s assertion that the facts of this case are
“precisely consistent” with the facts of Skillern and Black.  See
Black, 527 S.W.2d at 800–01 (holding that there was evidence of false
imprisonment when the plaintiff was told that if she did not admit to taking
money, she would be handcuffed, taken to jail, and “would not see her daughter
for a long time”); Skillern, 379 S.W.2d at 689 (holding that evidence
supported false imprisonment when, according to the plaintiff, she was
physically restrained and was told that she could not leave until she admitted
stealing money and merchandise).  Finally, we disagree that Sorrells’s telling
appellant that Sorrells would report the results of the interview to Carter
BloodCare’s management amounts to evidence of a willful detention.  In most
serious employment investigations, employees could reasonably feel compelled to
defend themselves in an attempt to avoid the prospect of an adverse employment
action, but a false imprisonment claim is generally not available when someone
remains in a location while attempting to establish innocence.  See Martinez
v. Goodyear Tire & Rubber Co., 651 S.W.2d 18, 21 (Tex. App.—San Antonio
1983, no writ).  Appellant testified that she stayed in the interview because
she “felt compelled to . . . try to defend [her] character.”  She has given
that same reason on appeal for staying in the interview.

          Comparing
the facts of this case, even when viewed in the light most favorable to
appellant, to the circumstances in the cases cited above in which courts held
that plaintiffs failed to raise fact issues on false imprisonment, we hold that
appellant did not present more than a scintilla of evidence to defeat appellees’
no-evidence motions for summary judgment on that claim.  See Tex. R.
Civ. P. 166a(i); Hamilton, 249 S.W.3d at 426.  We therefore conclude
that the trial court did not err by granting summary judgment for appellees on
the claim, and we overrule appellant’s second issue.

Intentional
Infliction of Emotional Distress

          In
her third issue, appellant contends that the trial court erred by granting
summary judgment on her intentional infliction of emotion distress (IIED) claim,
which she filed against only EPS and Sorrells.  A claim for IIED requires the
plaintiff to show intentional or reckless conduct that was extreme and
outrageous and that caused the defendant severe emotional distress.  See Leachman
v. Dretke, 261 S.W.3d 297, 315 (Tex. App.—Fort Worth 2008, no pet.) (op. on
reh’g) (citing Hoffmann-La Roche Inc. v. Zeltwanger, 144 S.W.3d 438, 445
(Tex. 2004)).  “An employee may recover damages for intentional infliction
of emotional distress in an employment context as long as the employee
establishes the elements of the cause of action.”  GTE Sw., Inc. v. Bruce,
998 S.W.2d 605, 611 (Tex. 1999).

          In
the trial court, EPS and Sorrells sought summary judgment on appellant’s IIED
claim on the basis, in part, that appellant could not provide evidence of extreme
and outrageous conduct.  It is for courts to determine, in the first instance,
whether a defendant’s conduct may reasonably be regarded as so extreme and
outrageous to permit recovery.  Id. at 616.  “Only when reasonable minds
may differ is it for the jury to determine whether conduct has been
sufficiently extreme and outrageous to result in liability.”  Canchola,
121 S.W.3d at 741.

          Extreme
and outrageous conduct is conduct “so outrageous in character, and so extreme
in degree, as to go beyond all possible bounds of decency, and to be regarded
as atrocious, and utterly intolerable in a civilized community.”  Zeltwanger,
144 S.W.3d at 445; Twyman v. Twyman, 855 S.W.2d 619, 621 (Tex. 1993). 
This “rigorous” legal standard helps “assure a meaningful delineation between
inadvertence and intentionally or recklessly outrageous misconduct.”  Twyman,
855 S.W.2d at 622.  Generally, “insensitive or even rude behavior does not
constitute extreme and outrageous conduct. Similarly, mere insults,
indignities, threats, annoyances, petty oppressions, or other trivialities do
not rise to the level of extreme and outrageous conduct.”  Bruce, 998
S.W.2d at 612 (citation omitted); see also Horton v. Montgomery Ward &
Co., Inc., 827 S.W.2d 361, 369 (Tex. App.—San Antonio 1992, writ denied) (“There
is no occasion for the law to intervene in every case where . . . feelings are
hurt.”).  “In deciding whether particular conduct rises to an extreme and
outrageous level, . . . courts should consider both the conduct’s context and
the parties’ relationship.”  Tex. Farm Bureau Mut. Ins. Cos. v. Sears,
84 S.W.3d 604, 610–11 (Tex. 2002).  “[T]he fact that an action is intentional,
malicious, or even criminal does not, standing alone, mean that it is extreme
or outrageous for purposes of intentional infliction of emotional distress.”  Brewerton
v. Dalrymple, 997 S.W.2d 212, 215 (Tex. 1999).

          The
Texas Supreme Court has recognized that to “properly manage its business, an
employer must be able to supervise, review, criticize, demote, transfer, and
discipline employees.”  Bruce, 998 S.W.2d at 612; see Sears, 84
S.W.3d at 610 (“It is simply not in the public’s interest to dissuade employers
from conducting internal investigations when employee-wrongdoing is suspected.”). 
Thus, that court has held that a claim for intentional infliction of emotional
distress does not lie for ordinary employment disputes, explaining,

The range of behavior encompassed in “employment
disputes” is broad, and includes at a minimum such things as criticism, lack of
recognition, and low evaluations, which, although unpleasant and sometimes
unfair, are ordinarily expected in the work environment.  Thus, to establish a
cause of action for intentional infliction of emotional distress in the
workplace, an employee must prove the existence of some conduct that brings the
dispute outside the scope of an ordinary employment dispute and into the realm
of extreme and outrageous conduct.  Such extreme conduct exists only in the
most unusual of circumstances.  

Bruce,
998 S.W.2d at 613 (citations omitted).

          In
Canchola, an employee had accused Canchola, her boss, of sexual
harassment.  121 S.W.3d at 738.  Canchola’s supervisor suspended him pending an
investigation of the harassment charge, and the supervisor eventually fired
Canchola.  Id.  Canchola sued his employer, claiming that the
investigation of the harassment charge was extreme and outrageous because an
employee had felt pressured into writing a statement against Canchola.  Id.
at 741.  The Supreme Court disagreed, stating,

          It is neither extreme nor outrageous for an
employer to ask an employee to share information concerning allegations made
against a coworker, even if it is an unpleasant experience.  An employer must
be given some leeway in investigating serious accusations made against its
employees.  Wal-Mart’s conduct in investigating and ultimately terminating
Canchola was understandably unpleasant for him, but it was an “‘ordinary
employment dispute.’”  Assuming that Canchola’s allegations about the
investigation were true, Wal-Mart’s conduct was “within the bounds of its
discretion to supervise, review, discipline, and ultimately terminate” its
employees.

Id. at
741–42 (citations omitted); see also Johnson, 891 S.W.2d at 644
(rejecting an IIED claim because an employer acted within its legal rights in
investigating reasonably credible allegations of an employee’s misconduct); Williams
v. First Tenn. Nat’l Corp., 97 S.W.3d 798, 805 (Tex. App.—Dallas 2003, no
pet.) (deciding that an employer’s questioning of an employee about personal
use of a company credit card in front of other employees was not extreme and
outrageous conduct); Sebesta v. Kent Elecs. Corp., 886 S.W.2d 459, 463–64
(Tex. App.—Houston [1st Dist.] 1994, writ denied) (refusing to assess liability
although the employee was yelled at and made to undergo an “exit parade” during
the busiest time of the day).

          At
trial and on appeal, appellant has contended that Sorrells’s conduct during her
interview of appellant, which was conducted under Carter BloodCare’s direction
as an attempt to investigate employee misconduct, was “plainly egregious”
because (1) Sorrells “was aware of the peculiar economic susceptibility of
[appellant] in threatening financial harm to her through loss of employment”;
(2) Sorrells “learned in the course of the interrogation of . . .
[appellant’s] psychological susceptibility and used this to further undermine
her equanimity”; and (3) Sorrells treated appellant as an accused individual,
using “machine-gun rhetorical questioning [and] assuming the truth of ugly allegations”
against appellant.  Appellant asserts that none of this behavior “can be viewed
as normal everyday conduct even by human resource consultants” such as
Sorrells.

          In
her brief, appellant does not refer us to where the record discloses that Sorrells
knew of appellant’s particular economic susceptibility and threatened financial
harm.  Appellant could be referring to the part of her deposition in which she
testified that during the interview, Sorrells informed her that she would be
reporting the information that she gathered to Carter BloodCare’s officials.[16] 
Sorrells’s deposition establishes that she learned during her interview with
appellant that appellant had sought counseling in relation to one of her transfers
at Carter BloodCare, but the deposition does not establish that Sorrells proceeded
with the interview differently based on that knowledge than she would have
without it.  Appellant testified in her deposition that she told Sorrells at
least three times that she was uncomfortable with Sorrells’s line of allegedly close-ended
questioning, which was “edgy” and “very accusatory and negative . . . .  It
seemed that her questions were posed to imply wrongdoing and misconduct and
misbehavior on my part.”  Appellant described Sorrells’s demeanor as
“aggressive and unrelenting,” stated that Sorrells asked her “insulting
questions” and made “insulting comments,” and explained that the interview,
which was “horrifying,” devastating, and shocking,

took almost an immediate turn in an attempt to intimidate
me, to accuse me, to degrade me, to make me feel less than, to soil my
reputation by repeating false allegations.  I literally could not understand
what was happening to me, the relevancy of these questions and why there was an
outside consultant having me in a closed room, rapid fire, asking me accusatory
close-ended questions, purposefully looking for an admission of misconduct on
my part.  I was shocked by it all.

          Viewing
these facts in the light most favorable to appellant, even if we were to assume
that Sorrells’s conduct in her one-time, three-hour interview of appellant was
inappropriate and failed to meet typical professional standards, we hold that
the facts are insufficient to raise a genuine issue of material fact on the rigorous,
exacting standard of extreme or outrageous conduct.  See Creditwatch,
Inc. v. Jackson, 157 S.W.3d 814, 815, 818 (Tex. 2005) (indicating that IIED
claims must typically be based on circumstances that border on “serious criminal
acts”).  Although Sorrells’s interview was understandably unpleasant for
appellant, the facts in this case resemble facts of cases in which courts
precluded recovery for IIED.  See id. at 817 (holding that there was no
extreme and outrageous conduct, but only “callous” and “mean-spirited” conduct,
when a company’s chief executive officer refused to give a terminated employee
a reference letter and allegedly orchestrated the employee’s eviction from a
house two months after the employee was terminated); Tiller v. McLure,
121 S.W.3d 709, 714 (Tex. 2003) (concluding that although the defendant acted inappropriately
and callously toward a woman whose husband was dying with a brain tumor, causing
the woman to cry, shake, and have insomnia, the defendant’s conduct was not
extreme and outrageous because the defendant never made physical threats and
did not use vulgar or obscene language); Brewerton, 997 S.W.2d at 216
(holding that although a defendant made negative and allegedly retaliatory comments
that were reflected in a professor’s tenure file and repeatedly recommended
that the professor should not be allowed to continue on a tenure track, this
conduct was not extreme and outrageous).  Likewise, the facts of this case are
dissimilar to facts that have compelled courts to allow an IIED claim to
proceed.  See Morgan v. Anthony, 27 S.W.3d 928, 929–30 (Tex. 2000);
Bruce, 998 S.W.2d at 613 (holding that there was evidence of extreme and
outrageous conduct when over a period of more than two years, a supervisor used
harsh language and sexual innuendo, physically threatened employees and charged
at them, screamed, and stared at them for as long as thirty minutes at a time);
see also Haynes & Boone, L.L.P. v. Chason, 81 S.W.3d 307, 311–14
(Tex. App.—Tyler 2001, pet. denied) (comparing cases in which courts recognized
the existence of extreme and outrageous conduct with cases in which courts
refused to do so); Fields v. Teamsters Local Union No. 988, 23 S.W.3d
517, 533 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (holding that a
trial court erred by granting summary judgment against an IIED claim when the
employee faced severe and continual sexual harassment over a three-month period).

          Because
we hold that appellant did not produce more than a scintilla of evidence of
extreme and outrageous conduct under the exacting standard mandated by the
supreme court, we hold that the trial court did not err by granting EPS and
Sorrells’s motion for summary judgment on her IIED claim, and we overrule her third
issue.

Breach
of Contract

          In
her fourth issue, appellant asserts that the trial court erred by granting
summary judgment against her claim that Carter BloodCare breached a contract by
disclosing her personnel file to Sorrells.  In appellant’s first amended
original petition, which was her live pleading at the time of the trial court’s
judgment, she stated, “For her third cause of action, Plaintiff would show that
purportedly confidential information was disclosed by [Carter BloodCare] under
circumstances in which such disclosure was not authorized.”  Carter BloodCare
construed this statement as raising a claim about invasion of privacy on the
public disclosure of private facts, and the company sought summary judgment on
the basis that appellant could produce no evidence on that claim.[17] 
In responding to Carter BloodCare’s motion for summary judgment, appellant
stated that her complaint about the disclosure of her personnel file was based
on breach of contract principles rather than invasion of privacy principles.  Specifically,
appellant contended that Carter BloodCare “agreed in its employment policies
that personnel information . . . would not be provided to third parties.”  Carter
BloodCare’s employee handbook, which appellant received during her employment,
states,

          The information contained in your personnel
file is the confidential property of [Carter BloodCare].  Due to the
confidential nature of personnel files, the Human Resource Department is
responsible for controlling all access to personnel files.

          . . .  Personnel files are not available for
review by former employees, unauthorized employees or outside parties except
where provided otherwise by law.  Generally, only supervisors and management
personnel of [Carter BloodCare] who have a legitimate reason to review information
in a file are allowed to do so.

The
handbook, however, also states that it is “not an employment contract or
contractual agreement.”[18]

          Carter
BloodCare objected to appellant’s attempt to “assert a claim which is outside
[of] the live pleadings,” and the company also objected to appellant’s
“apparent attempt to try this issue by consent.”  The trial court sustained
this objection.  Thus, because the trial court precluded appellant’s attempt to
expressly raise a breach of contract claim for the first time during the
summary judgment proceedings and because appellant has not expressly appealed
that decision, we will not consider the merits of the claim.  See Frazier,
987 S.W.2d at 610.  We overrule appellant’s fourth issue.

Defamation

          In
her fifth issue, appellant asserts that the trial court erred by granting summary
judgment for Carter BloodCare on her defamation claim.  In the trial court, appellant
pled that employees of Carter BloodCare, acting within the scope of their
employment, “made false defamatory statements to Sorrells.”  Through an
interrogatory, Carter BloodCare asked appellant to identify each employee who
had defamed her and to state the gist of the defamatory comment.  Appellant
replied that the employees who had defamed her included, but were not limited
to, Ridley, Norman, Barlow, Serrano, Ronda Willis, and Melissa Court.  Later,
in a deposition, when asked who had defamed her, appellant responded that
Court, DiAnna Richardson, Willis, Serrano, and Barlow had done so, and that she
could not think of anyone else “at [that] time.”

          Carter
BloodCare sought summary judgment on the bases that appellant had no evidence
of her defamation claim, that the comments over which appellant sued were not
defamatory as a matter of law, that the company had a qualified privilege regarding
the comments, and that claims about some of the comments were barred by a
statute of limitations.  Appellant responded by stating that the communications
supporting her defamation claim fell into categories of (1) statements by
appellant’s subordinates about appellant that were made in a 360-degree review,
and (2) statements made during interviews with Sorrells and republished to
senior management representatives of Carter BloodCare.  Appellant has referred
to these same categories on appeal.

          For
a private plaintiff (instead of a public official or public figure) to maintain
a defamation claim, the plaintiff must show that the defendant, while acting
with negligence, published a statement that was defamatory concerning the plaintiff. 
Fox Entm’t Group, Inc. v. Abdel-Hafiz, 240 S.W.3d 524, 531 (Tex. App.—Fort
Worth 2007, pet. denied) (op. on reh’g); see AccuBanc Mortg. Corp. v.
Drummonds, 938 S.W.2d 135, 147 (Tex. App.—Fort Worth 1996, writ denied)
(explaining that statements are published when they are “communicated orally,
in writing, or in print to some third person capable of understanding their
defamatory import and in such a way that the third person did so understand”). 
A statement is defamatory when it tends to injure a person’s reputation.  See
San Antonio Express News v. Dracos, 922 S.W.2d 242, 247 (Tex. App.—San
Antonio 1996, no writ).  Slander is a defamatory statement that is orally
communicated or published to a third person without legal excuse.  Johnson,
891 S.W.2d at 646.  In suits brought by private individuals, truth is an
affirmative defense to slander.  Id.  But a statement may be false,
abusive, unpleasant, or objectionable to the plaintiff and still not be
defamatory in light of the surrounding circumstances.  See Ezrailson v.
Rohrich, 65 S.W.3d 373, 376 (Tex. App.—Beaumont 2001, no pet.).  Also, a
defamatory statement must be sufficiently factual to be susceptible of being
proved objectively true or false, as contrasted from a purely subjective assertion.
 Thomas-Smith v. Mackin, 238 S.W.3d 503, 507 (Tex. App.—Houston [14th
Dist.] 2007, no pet.).

          On
appeal, appellant refers generally to more than forty pages of the record that she
claims contain defamatory comments.[19]  These pages, comprising
deposition transcripts and Sorrells’s handwritten notes from her sixteen interviews
of Carter BloodCare’s employees, contain numerous statements concerning
appellant, including, as a sample of the statements, that appellant had promoted
herself; had created turmoil; had intimidated people; had pressured employees; had
called someone a “twit”; had threatened someone; had treated someone unfairly;
had made unflattering statements about a coworker’s character; had told an
employee, “If I ever hear you say anything, your life will not be worth a thin
dime”; had violated standard operating procedures; had said that she would
destroy anyone who challenged her; and had said that an employee was “full of
shit.”  Appellant has not indicated whether she relies on all of these comments
in her defamation claim or on only some of them.  And in both her brief on
appeal and in her brief in support of her response to Carter BloodCare’s motion
for summary judgment in the trial court, appellant failed to apply the defamation
principles explained above to any of these statements or the other comments
contained in the record pages that she has cited.  Instead, in her brief on
appeal, appellant contends only that the statements were collectively
defamatory because they referred to her and were calculated to injure her and to
impute dishonesty toward her.

          An
appellate brief must contain argument and the authorities and facts relied upon
for the appeal.  Allegiance Hillview, L.P. v. Range Tex. Prod., LLC, 347
S.W.3d 855, 873 (Tex. App.—Fort Worth 2011, no pet.); see Tex. R. App.
P. 38.1(i).  An inadequately briefed issue may be waived on appeal.  Allegiance
Hillview, L.P., 347 S.W.3d at 873 (overruling a party’s issue about the
trial court’s failure to grant the party’s request for additional findings of
fact and conclusions of law because the party did not “identify which requested
but refused additional finding prevented it from properly presenting its
appellate argument”); Hall v. Stephenson, 919 S.W.2d 454, 467 (Tex. App.—Fort
Worth 1996, writ denied) (noting that we are not generally required to search
the record to find support for a party’s contentions); see also Fredonia
State Bank v. Gen. Am. Life Ins. Co., 881 S.W.2d 279, 284 (Tex. 1994)
(discussing the “long-standing rule” that a point may be waived due to
inadequate briefing).  As the El Paso Court of Appeals has explained, it is an
appellant’s burden to discuss assertions of error, and “we have no duty—or even
right—to perform an independent review of the record and applicable law to
determine whether there was error.  Nor are we required to sift through the
record in search of facts supporting a party’s position.”  Rubsamen v.
Wackman, 322 S.W.3d 745, 746 (Tex. App.—El Paso 2010, no pet.) (citation
omitted).

          We
decline to search through appellant’s globally cited forty pages of the record,
unaided by a tailored argument by appellant, in an attempt to sort statements
that may meet the criteria for defamation from comments that do not.  See
id.; Most Worshipful Prince Hall Grand Lodge, Free & Accepted Masons
of Tex. & Jurisdiction v. Jackson, 732 S.W.2d 407, 412 (Tex. App.—Dallas
1987, writ ref’d n.r.e.) (en banc) (“This court is not required to search the
record for evidence supporting a litigant’s position under particular points of
error . . . .”).  Because defamation is based on a statement and because
appellant has not directed us to a specific statement that was defamatory, we
overrule her fifth issue as inadequately briefed.

Conclusion

          Having
overruled each of appellant’s issues, we affirm the trial court’s judgment.

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; DAUPHINOT, J.; and DIXON W. HOLMAN (Senior Justice, Retired, Sitting by
Assignment).

 

DELIVERED:  January 5, 2012









[1]See Tex. R. App. P. 47.4.





[2]Carter BloodCare receives
blood donations and provides blood components to hospitals and other medical
centers.  The donor collections department is responsible for drawing blood
products from donors.





[3]Appellant stated that
Norman, who had been a good employee, resigned because she was offended by
something that appellant had said at a business lunch.  Appellant testified
that she had nothing to do with Barlow’s resignation.





[4]The technical writing
department was designed to write policies for Carter BloodCare’s other
departments and implement revisions to Carter BloodCare’s processes.





[5]The respondents also said
positive things about appellant, including that she was knowledgeable about the
blood banking industry, that she “seem[ed] to have a firm focus on what [was] best
for Carter BloodCare,” that her attitude was “always positive,” that she was
cheerful, that she was “quality minded,” and that she had an “[a]bility to
think outside the box.”  Appellant opined in her deposition that Carter
BloodCare’s employees were not properly trained about how to complete the
360-degree reviews.  She said that she was mischaracterized by the reviews
because employees who completed the survey had a “negative agenda.”





[6]As discussed below,
appellant later relabeled her invasion of privacy claim as a breach of
contract.





[7]In enacting section
21.051, the legislature intended to correlate state law with federal law in
employment discrimination cases; thus, we may rely on federal law to interpret
and apply section 21.051.  See M.D. Anderson Hosp. & Tumor Inst. v.
Willrich, 28 S.W.3d 22, 24 (Tex. 2000); Cox v. Waste Mgmt. of Tex., Inc.,
300 S.W.3d 424, 432 (Tex. App.—Fort Worth 2009, pet. denied).





[8]This burden is “not
onerous.”  Quantum Chem. Corp. v. Toennies, 47 S.W.3d 473, 477 (Tex.
2001).





[9]See Tex. Labor Code
Ann. § 21.101 (West 2006).





[10]Appellant’s briefing
focuses on her termination as Carter BloodCare’s adverse employment action.





[11]It seems that much of
appellant’s testimony concerning these events was based on second-hand
information.  Appellant admitted that her information about Liles was based on
“office gossip” and that she had “heard” that Biersmith was a taskmaster.





[12]Although appellant
attempted to raise a complaint about the trial court’s evidentiary ruling in a
postsubmission letter, we have held that a “reply brief may not be used to
raise new complaints.”  Penley v. Westbrook, 146 S.W.3d 220, 227 (Tex.
App.—Fort Worth 2004), rev’d on other grounds, 231 S.W.3d 389 (Tex.
2007); see Dallas Cnty. v. Gonzales, 183 S.W.3d 94, 104 (Tex.
App.—Dallas 2006, pet. denied) (op. on reh’g) (“The Texas Rules of Appellate
Procedure do not allow an appellant to include in a reply brief a new issue in
response to some matter pointed out in the appellee’s briefs but not raised by
the appellant’s original brief.”).





[13]Federal courts have
likewise held that in a disparate treatment claim, the compared employee must
be significantly younger than the plaintiff.  See, e.g., Radue v.
Kimberly-Clark Corp., 219 F.3d 612, 619 (7th Cir. 2000) (holding that a
seven-year difference was not significant). 





[14]Appellant testified that
when she was transferred in 2005, she was “being treated differently than
younger employees that had similar allegations and problems with the company.” 
Carter BloodCare objected to this evidence, and the trial court excluded it. 
Appellant states in her brief that her second transfer was “justified on the
positive basis of urging her to take it.”





[15]Two of the employees that
Stefan allegedly met with regularly are Liles and Norman.  As explained above,
appellant did not produce evidence that Liles and Norman are significantly
younger than she is.





[16]The Beaumont Court of
Appeals has stated, “A threat to fire someone and ruin their career falls
within the type of ordinary business dispute that is not actionable as a claim
for intentional infliction of emotional distress.”  Louis v. Mobil Chem. Co.,
254 S.W.3d 602, 609 (Tex. App.—Beaumont 2008, pet. denied).





[17]See Star-Telegram,
Inc. v. Doe, 915 S.W.2d 471, 473–74 (Tex. 1995) (listing the elements of
the invasion of privacy tort).





[18]Appellant does not cite
authority in the part of her brief relating to her breach of contract claim,
nor does she state the elements of that claim.  For this reason, in addition to
the reason discussed below, we decline to consider the merits of the claim.  See Tex.
R. App. P. 38.1(i); Gray v. Nash, 259 S.W.3d 286, 294 (Tex. App.—Fort
Worth 2008, pet. denied).  We note that we have held that employee handbooks
generally do not create contracts and that this is “particularly true if the
handbook contains a disclaimer.”  Brown v. Sabre, Inc., 173 S.W.3d 581,
585–86 (Tex. App.—Fort Worth 2005, no pet.); see Fed. Exp. Corp. v.
Dutschmann, 846 S.W.2d 282, 283 (Tex. 1993) (stating that a disclaimer in
an employee handbook negates any implication that personnel procedures create
contractual relationships).





[19]Appellant refers
specifically to only one alleged comment that she proposes was defamatory; she
states that someone accused her of “criminal conduct of stealing.”  We cannot
locate in the record where anyone accused appellant of taking something with
criminal purposes.